55 A.3d 1056

**MERCURY TRUCKING, INC., Appellee,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Appellant.**

Supreme Court of Pennsylvania.

Argued March 8, 2011.

Decided Nov. 21, 2012.

178

Elizabeth A. Lion Januzzi, Bohdan R. Pankiw, Eric Albert Rohrbaugh, Harrisburg, PA Public Utility Commission, for Pennsylvania Public Utility Commission.

William A. Gray, William Howard Stewart, Vuono & Gray, L.L.C., Pittsburgh, for Mercury Trucking, Inc.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Chief Justice CASTILLE.

The Pennsylvania Public Utility Commission (the "Commission"), a statutory regulatory authority, appeals the decision of the Commonwealth Court to vacate an operations fee assessed against a public utility, appellee Mercury Trucking, Inc.

("Mercury"), for the operating period of July 1, 2005, through June 30, 2006 (the "2005 annual assessment"). At this Court's request, the parties also address issues related to the appropriate process by which disputes of this nature should proceed in the courts of the Commonwealth.

For the reasons that follow, we hold that judicial review of a public utility's challenge to its annual assessment shall proceed in the courts of this Commonwealth in accordance with the procedures of the Administrative Agency Law, Chapter 7, Subchapter A. Accordingly, we must quash the Commission's direct appeal. However, given that the proper procedure was unclear, and that the underlying issue merits review, we will treat the Commission's notice of appeal as a petition for allowance of appeal, which we hereby grant. On the merits, we reverse the decision of the Commonwealth Court, vacate its judgment in favor of the public utility, and reinstate the Commission's adjudication.

### *Background*

The Commission is the administrative agency which has the authority to oversee all public utilities doing business in the Commonwealth and which implements and enforces the Pennsylvania Public Utility Code by its regulations, orders, or otherwise. 66 Pa.C.S. § 501(a), (b); *see, generally,* 66 Pa.C.S. § 101 *et seq.* Expenditures of administering the Code are borne in part by the public utilities that the Commission regulates. *See* 66 Pa.C.S. § 510(a). That part of the Commission's budget collected from public utilities—the "total assessment"—is allocated among all Commission-regulated public utilities in the manner prescribed by Section 510(b) of the Code. *See* 66 Pa.C.S. § 510(b)(1)-(4).

Each utility pays a share roughly proportional to its actual or estimated gross intrastate operating revenue. *See* 66 Pa. C.S. § 510(b). The Section 510(b) statutory formula is a complex four-step calculation centered on the Commission's administrative expenditures and on gross intrastate operating revenues of all public utilities regulated by the Commission, during the calendar year preceding the relevant operating

period. *See id.* The Commission receives necessary data relating to each public utility's actual gross operating revenue in Pennsylvania from the utilities ("actual revenue(s)").

According to the Public Utility Code, each utility is required to file a statement under oath reporting the utility's actual revenue for the year preceding the assessment, on or before March 31 of the assessment year. *See* 66 Pa.C.S. § 510(b). For any public utility that fails to file a timely actual revenue statement, the Commission is required to estimate the revenue, and the estimated gross operating revenue ("estimated revenue(s)") is used to calculate that utility's assessment, along with the allocation of the total assessment among all public utilities operating in the Commonwealth.

Appellee Mercury Trucking, Inc. operates as a public utility under the Commission's authority. In 2005, Mercury failed to file by March 31 the statement of its actual revenue for 2004. On April 29, 2005, the Commission notified Mercury of its omission. Subsequently, the Commission estimated Mercury's revenue for 2004 at $8,492,767, equal to Mercury's actual revenue for 2003 of $7,582,828 plus twelve percent, and calculated Mercury's 2005 annual operations fee based on this estimated revenue.[1] On August 17, 2005, the Commission issued Mercury a Notice of Assessment and General Assessment Invoice for $32,210. Mercury paid the 2005 annual assessment in full.

Concomitantly, Mercury objected to the assessment on the ground that the Commission's estimate of its 2004 revenue was excessive, and presented evidence that its actual revenue was $5,264,627—more than three million dollars less than the revenue estimated by the Commission. Mercury argued that it was entitled to a recalculation of its 2005 annual assessment,

1. There is no information in the record regarding the factors used to calculate Mercury's estimated revenue. In its adjudication, the Commission viewed the twelve percent increase "as an exercise of Commission discretion and reasoned decision-making." Commission's Opinion, 5/22/2006, at 12 n. 4. Here, Mercury offers no challenge either to the process of calculating the estimate in general, nor to the accuracy of the calculation or the propriety of the resulting twelve percent increase in its case.

which it claimed should have been $19,967.02, and requested a partial refund of $12,242.98. The Commission responded that the 2004 revenue estimate was binding upon Mercury pursuant to Section 510(b) of the Code and, as a result, the 2005 operations fee was correctly assessed. The parties presented their arguments to an Administrative Law Judge ("ALJ") for rulings on Mercury's objections and on the Commission's motion to dismiss the objections. The ALJ denied the Commission's motion and, ultimately, determined that the Commission's revenue estimate was excessive and a partial refund of Mercury's assessment payment was appropriate. On May 22, 2006, a five-member adjudicatory panel of the Commission reversed the decision of the ALJ and denied Mercury's request for a refund. Mercury filed a petition for review of the Commission's decision in the Commonwealth Court's appellate jurisdiction.

In May 2007, a Commonwealth Court panel determined that Mercury's challenge should have been filed as an action at law for a refund pursuant to Section 510(d) of the Public Utility Code, and not as an appeal. The panel transferred the matter to the court's original jurisdiction, vacated the Commission's order of May 22, 2006, and directed the Commission to file a responsive pleading to Mercury's challenge within twenty days. *See Mercury Trucking, Inc. v. Pa. Pub. Utility Comm'n,* 923 A.2d 1244, 1247 (Pa.Cmwlth.2007) (*"Mercury Trucking I "*). Judge Hannah Leavitt dissented in part, noting that the majority was "announc[ing] a ground breaking decision" with respect to the jurisdictional issue, "without allowing the parties an opportunity to brief or argue the dispositive issues." *Id.* at 1248.

The Commission filed a timely answer with new matter, in addition to preliminary objections to Mercury's petition for review. The court dismissed the answer and new matter as premature, and the Commission appealed the decision to this Court. We quashed the Commission's interlocutory appeal in October 2007. Subsequently, the Commonwealth Court held a hearing on the Commission's preliminary objections, which the court then overruled in March 2008. Cmwlth. Ct. Op.,

3/7/2008, at 6 *("Mercury Trucking II ")*. The Commission filed a second appeal, which we also quashed.

The case remained dormant until March 2009, when the Commonwealth Court issued a rule for Mercury to show cause why the action should not be dismissed for failure to prosecute. Mercury responded; the court discharged the rule and directed the parties to file a stipulation of facts. In November 2009, a Commonwealth Court panel reviewed the evidence *de novo* and found that Mercury overpaid its 2005 annual assessment. The panel ordered the Commission to refund Mercury $12,242.98. Cmwlth. Ct. Op., 11/16/2009, at 6 *("Mercury Trucking III ")*. The Commission filed a direct appeal to this Court.

Upon reviewing the Commission's jurisdictional statement, we postponed decision of three issues related to jurisdiction, and directed briefing and argument on the following questions:

1. Whether a suit filed against the Commonwealth by a public utility under 66 Pa.C.S. § 510(d) from an order of the [Commission] is brought in the Commonwealth Court's original jurisdiction under 42 Pa.C.S. § 761 or in the Commonwealth Court's appellate jurisdiction under 42 Pa.C.S. § 763? Include a discussion of the [Commission]'s position in *United Parcel Service, Inc. v. Pennsylvania Pub. Util. Comm'n*, 789 A.2d 353 (Pa.CmwIth[Cmwlth].2001), *vacated and remanded*, [574 Pa. 304], 830 A.2d 941 (Pa.2003), on this issue.

2. Whether this Court has jurisdiction under 42 Pa.C.S. § 723(a) or 42 Pa.C.S. § 724(a) to review a final order entered by the Commonwealth Court in a suit filed against the Commonwealth by a public utility under 66 Pa.C.S. § 510(d) from an order of the [Commission]?

3. Whether a suit that was filed in the Commonwealth Court's appellate jurisdiction by a public utility under 66 Pa.C.S. § 510(d) from an order of the [Commission] and thereafter transferred to and decided in the Commonwealth Court's original jurisdiction was "originally commenced" in

the Commonwealth Court within the meaning of 42 Pa.C.S. § 723(a)?

4. Whether the Commonwealth Court erred as a matter of law by not finding that, pursuant to § 510(b) of the Public Utility Code, where the utility fails to supply its intrastate revenue report the Commission's revenue statement is "binding" for purposes of the assessment calculation and any subsequent assessment objection under § 510(d)?

The parties complied and filed their respective briefs. We address each issue in turn, developing the facts and arguments as necessary.

### Judicial Review in Assessment Matters

#### A. Commonwealth Court Process: Original or Appellate Jurisdiction

#### I.

The Public Utility Code, Section 510(c)-(d), delineates the administrative process for collecting annual assessments from public utilities. Upon calculation of the assessments, the Commission notifies each public utility of the amount owed, and the public utility has the opportunity to file objections with the Commission within fifteen days of receiving the notice. Objections are cognizable on several enumerated grounds, and the Commission is required to hold a hearing concerning the objections. The Commission issues findings and notifies the public utility of its decision with respect to the objections, including the amount owed. The public utility is then obliged to pay the assessment within ten days of receiving notice, on penalty of suspension or revocation of its license for operations. The Commission may institute legal action to ensure prompt payment of the assessment, and the public utility may not act to avoid or delay such payment. 66 Pa.C.S. § 510(c)-(d). The subsequent process of judicial review is the first subject of dispute between Mercury and the Public Utility Commission.[2]

---

**2.** The dispute has practical implications for the litigants in terms of the scope of review and deference accorded the agency's determination,

As a practical matter, Mercury initiated the case in the Commonwealth Court by filing a petition for review—in the nature of an appeal—from the Commission's adjudication of Mercury's objections to the 2005 assessment. The Commonwealth Court *sua sponte* transferred the case to its original jurisdiction, deciding the matter without relevant briefing. *See Mercury Trucking I*, 923 A.2d at 1248 (Leavitt, J., concurring and dissenting). In support of its decision, the panel majority simply quoted Section 510(d) of the Public Utility Code and offered no further analysis. The Commonwealth Court then acted on Mercury's petition for review as it would have on a complaint in an action at law. *Id.* at 1247 (quoting 66 Pa.C.S. § 510(d); 42 Pa.C.S. § 708(b)). The Commission appealed, essentially claiming that its adjudication of Mercury's objections is subject to the Commonwealth Court's review as an appeal from an agency adjudication pursuant to the Administrative Agency Law ("AAL"), 2 Pa.C.S. §§ 701–704. Conversely, Mercury insists that the Commission's determination of its annual assessment is subject to *de novo* challenge in an action at law for a refund, pursuant to the discrete review process described in Section 510(d) of the Public Utility Code, 66 Pa.C.S. § 510(d).

Specifically, the Commission argues that the AAL creates a process to appeal Commonwealth agency decisions, irrespective of whether the agency's enabling statute forecloses an appeal and/or provides an alternative method of challenging such decisions in the Commonwealth Court's original jurisdiction. *See* Commission's Brief at 10–12 (citing 2 Pa.C.S. § 701(a), (b)). The General Assembly, the Commission claims, adopted the AAL as a uniform process of adjudication for all administrative agency disputes, including those relating to the Commission's annual assessments. In anticipation of Mercury's argument, the Commission offers that Section 510(d) of the Code was reenacted following the 1978 adoption of the AAL, but notes that the General Assembly did not intend to supersede the uniform procedure generally applicable to the

and the related burden of proof on the moving party, in the Commonwealth Court. *Compare* 2 Pa.C.S. § 704 *with* 66 Pa.C.S. § 510(d).

Commission as a Commonwealth agency. Commission's Brief at 12 (citing *Mar. Mgmt., Inc. v. Pa. Liquor Control Bd.*, 531 Pa. 95, 611 A.2d 202 (1992)). According to the Commission, any exemption from the AAL must be express and the Code does not contain any explicit provision to that effect. *Id.* (citing 2 Pa.C.S. § 106).

Moreover, the Commission emphasizes that the Public Utility Code procedure is cumbersome because it provides one "factual adjudication of the assessment objection, only to require [a second] on-the-record factual adjudication before [the] Commonwealth Court" within two years of the initial adjudication. *Id.* at 11–12 (citing 66 Pa.C.S. § 510(d)). The practical effects of that process, the Commission states, are to deny the parties their constitutional right to an appeal and to cause severe and unnecessary delays in concluding assessment disputes. The delay, according to the Commission, invites budgetary uncertainty and potential cash flow problems for the Commission. By comparison, the Commission claims that the AAL provides an appropriate and efficient process, consisting of an administrative adjudication, followed by an appeal of right to the Commonwealth Court within thirty days of the adjudication.

Finally, the Commission emphasizes that this matter "commenced" and received a full and fair hearing at the agency level, and was adjudicated by the agency in the first instance. The Commonwealth Court acted on Mercury's petition for review of the agency adjudication, rendering a decision grounded on stipulated facts developed during the Commission's hearings. According to the Commission, original jurisdiction is properly limited to matters commenced in the Commonwealth Court and, therefore, the panel should have decided this case within its appellate jurisdiction. *Id.* at 14–16 (citing 42 Pa.C.S. § 763(a); *Pa. Dep't of Aging v. Lindberg*, 503 Pa. 423, 469 A.2d 1012 (1983) (Opinion Announcing Judgment of Court) ("*Lindberg*")).[3] The Commis-

---

**3.** The Commission addresses *Lindberg* at some length to distance itself from the position that Section 510(d) describes the exclusive judicial process available to public utilities challenging annual assessments, a

sion concludes that the lower court panel erroneously transferred appellee's petition for review from its appellate to its original jurisdiction.

Mercury disagrees and claims that Section 510(d)-(e) of the Public Utility Code precludes an appeal from the Commission's adjudication, and mandates that the "exclusive remedy" by which to challenge an annual assessment is an action at law for a refund against the Commonwealth. Mercury's Brief at 5–6 (citing 66 Pa.C.S. § 510(d), (e)). According to Mercury, the Commission only abandoned this interpretation of Section 510 for the purposes of this litigation, although it successfully forwarded it in prior litigation. *Id.* at 6–8 (citing *United Parcel Serv., Inc. v. Pa. Pub. Utility Comm'n*, 789 A.2d 353 (Pa.Cmwlth.2001) ("*UPS I* ")).

Mercury maintains that the AAL is inapplicable here because Mercury challenges a Section 510 assessment and "has not appealed a final adjudication of the Commission." Mercury disputes that either the revenue estimate or the annual assessment are final adjudications of the Commission, given that the Code permits objections to the assessment. Mercury also argues that the Commission's decision on its objections to the assessment, *see* 66 Pa.C.S. § 510(c), is not a final adjudication because the Code permits no subsequent appellate review. *Id.* at 9 (quoting *United Parcel Serv., Inc. v. Pub. Utility Comm'n*, 933 A.2d 672, 676 (Pa.Cmwlth.2007), *appeal denied,* 596 Pa. 496, 946 A.2d 637 (2008) ("*UPS II* ")). Relying on the

stance it had taken in *United Parcel Service, Inc. v. Pennsylvania Public Utility Commission,* 789 A.2d 353 (Pa.Cmwlth.2001) ("*UPS I* "). Heeding this Court's request, the Commission explains that, in *UPS I:* "[t]he Commission's argument was based on the misconception that the absence of any right to review was the essential factor to determine if the AAL superseded" Section 510(d) of the Code. According to the Commission, because the Code provided an alternative process, the Commission previously had "erroneously concluded" that the AAL did not come into play; but, after further consideration of the AAL's fundamental purpose of establishing "clear, uniform and timely procedures to challenge agency adjudications," the Commission has changed its position. Commission's Brief at 17–18. We primarily discuss *Lindberg,* and its companion case *O'Brien v. Commonwealth, State Employes' Retirement System,* 503 Pa. 414, 469 A.2d 1008 (1983), in addressing the third issue on appeal.

plain language of Section 510 and subscribing to the skeletal reasoning of *UPS I* and *UPS II,* Mercury distinguishes determinations of assessment challenges from other Commission adjudications, which it concedes are subject to the AAL. Mercury claims that Section 510(d) alone is applicable here because the provision addresses the judicial review procedure specific to the type of challenge Mercury filed, and finds "misleading and without merit" the Commission's argument that Section 701 of the AAL precludes an action at law pursuant to that provision.

Mercury acknowledges that assessment objections do not commence in the Commonwealth Court but argues the fact is irrelevant, because the panel below did not decide the case on this ground. Mercury also addresses the decision in *Lindberg, supra,* but uses circular reasoning to find it distinguishable because the Commonwealth Court here transferred the matter to its original jurisdiction and, therefore, the action commenced in that court. Mercury faults the Commission for failing to give sufficient deference to the panel's *Mercury Trucking I* decision, which transferred the matter to the court's original jurisdiction.

In its reply brief, the Commission challenges Mercury's argument that the Commission's May 22, 2006, order was not a final adjudication. The Commission explains that its decision, which Mercury appealed to the Commonwealth Court, was a final administrative determination affecting Mercury's personal or property rights, and suggests to the Court that the decision's finality should result "from a practical rather than a technical interpretation, taking into account the order's ramifications." Commission's Reply Brief at 3–4. The Commission argues that agency proceedings regarding assessments are "identical" to all other Commission proceedings and should be similarly considered adjudications for the purposes of the AAL. The Commission urges the Court to reject Mercury's "linguistic gyrations" intended to avoid the plain and uniform application of the AAL.

## II.

We begin by remarking that the parties offer overlapping arguments on the several issues on which we requested briefing, and generally undertake a scattered approach to the jurisdictional questions. This difficulty requires us to comment first on several preliminary matters in an effort to clarify our decisional focus.

Our first observation is that the parties are in silent, but obvious, accord that the General Assembly did not intend for both an appeal process and an action at law for a refund to be available concurrently and provide parallel avenues of relief in the assessment paradigm. Thus, Mercury and the Commission offer competing interpretations of the relevant provisions, both of which exclude a potential compromise position. As we discuss further, *infra*, the statutory construct and our caselaw support the zero-sum game arguments of the parties. *See, e.g., Lindberg*, 469 A.2d at 1017 (where appeal is available and adequate, resort to original jurisdiction is not available). Accordingly, we proceed in agreement with the parties on this point and address the jurisdictional question as primarily requiring a determination of whether the General Assembly intended the AAL scheme **or** the Section 510(d)-(e) process to be the exclusive means of challenging the Commission's assessment decisions.

Second, we note that the Commission decision subject to review by the Commonwealth Court is the determination of Mercury's objections to the initial annual assessment. In this sense, we agree with Mercury that the Commission's estimate of Mercury's revenue and the initial annual assessment are not "final orders" of the Commission subject to review for the purposes of determining appellate jurisdiction. *See* 42 Pa.C.S. § 763 (Commonwealth Court has "exclusive jurisdiction of appeals from final orders of government agencies"). The Public Utility Code requires a utility to exhaust the administrative process, as payment in full of the assessment and the filing of objections are prerequisites to pursuing a challenge in the Commonwealth Court. *See* 66 Pa.C.S. § 510(c); *cf. Kow-*

*enhoven v. County of Allegheny*, 587 Pa. 545, 901 A.2d 1003, 1010 (2006) ("Legislature generally retains the power to channel issues ... into a specified route of appeal."). Neither party disputes the applicability of this administrative review process. Accordingly, the question before us is limited to whether the Commission's final action upon a utility's objections to the assessment is subject to judicial review via appeal or whether relief is available exclusively via the Section 510(d) process.

In this respect, Mercury argues that the Commission's decisions regarding objections to initial assessments are also not "final orders" for jurisdictional purposes, because the Public Utility Code permits no subsequent review of such decisions. But, this argument is tautological: Mercury presumes what it is seeking to prove, that the Public Utility Code's bar on appeals is valid and an appeal process pursuant to the AAL is unavailable.

■ An "order," according to the Judicial Code, includes a "judgment, decision, decree, sentence and adjudication." 42 Pa.C.S. § 102. "Adjudication," according to the AAL, is a type of order, described as: "[a]ny final order, decree, decision, determination or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all of the parties to the proceeding in which the adjudication is made." 2 Pa.C.S. § 101. The Public Utility Code offers no relevant definitions of these or similar terms. *See* 66 Pa.C.S. § 101 *et seq.* The terms "final orders," "order," and "adjudication" are terms of art with "peculiar and appropriate meaning[s]," and which the Judicial Code and the AAL use consistently where questions of appealability and jurisdiction are concerned. *See* 1 Pa.C.S. § 1903. Mercury offers no purpose, and we perceive no reason, to depart from such meanings here. The Commission's decision of March 22, 2006, disposing of Mercury's objections to the 2005 annual assessment, unquestionably affected the utility's liabilities and obligations, and its property rights; ergo, Mercury was aggrieved. Accordingly, we have no reservations in viewing the Commission's decision as an adjudication and a "final order"

for purposes of Section 763 of the Judicial Code. We decline to adopt Mercury's assertion to the contrary.

■ We are similarly unpersuaded by Mercury's argument that the Commonwealth Court's action of transferring the matter to its original jurisdiction is dispositive and forecloses plenary review of the jurisdictional question before the Court. A party, or the parties by agreement, may not vest subject matter jurisdiction in a court which does not have it otherwise. *Smethport Area Sch. Dist. v. Bowers*, 440 Pa. 310, 269 A.2d 712, 715 (1970) (*"Bowers"*). Here, the Commonwealth Court transferred the matter to its original jurisdiction because it concluded that the matter was filed in the wrong division of the court. If appeal is taken to a division of court to which such matter is not allocated by law, the court, upon assessing the jurisdictional defect, may transfer the record to the proper division. 42 Pa.C.S. §§ 708(a)-(d); 5103(c). The Commonwealth Court's transfer decision is a proper subject of plenary appellate review by this Court.

Finally, we address Mercury's contentions regarding the Commission's position in *UPS I* and *UPS II*. *UPS I* is a 2001 decision of the Commonwealth Court which set the precedent for the panel decision below. In *UPS I*, as here, the Commonwealth Court transferred a utility's petition for review of an assessment decision to its original jurisdiction. 789 A.2d at 357. In support of the decision, the *UPS I* panel recited the Commission's argument and quoted the Public Utility Code, but offered no further analysis of the issue. The parties did not seek further review in this Court.

In *UPS II*, a 2007 decision of the Commonwealth Court, the panel quashed an interlocutory appeal as improvidently granted, on the ground that the Commission's assessment decisions are not subject to appeal. *UPS II*, 933 A.2d at 676 (citing *Mercury Trucking I*, 923 A.2d 1244; 66 Pa.C.S. § 510(d)). The court noted that when UPS was granted permission to appeal, *Mercury Trucking I* had not yet been filed but the decision now governed the disposition of the case; the panel offered no further analysis. This Court denied permission to

appeal the *UPS II* decision, and Mr. Justice Saylor filed a dissenting statement. *See* 946 A.2d at 637.

In this appeal, we invited the parties to address the *UPS I* decision. In this regard, Mercury appears to forward a two-pronged argument that either the Commission is precluded from challenging the lower court's decision by its position in *UPS I*, or that the Commission's stance here should not be accorded any deference because it was adopted for the first time in pending litigation. But, the legal basis of Mercury's argument is undeveloped and, at least with respect to its first prong, is without support. To the extent this first part of the argument implicates estoppel, Mercury forwards no claim that it relied on the Commission's position in *UPS I*, detrimentally or otherwise, in filing its challenge in the Commonwealth Court. In fact, Mercury pursued an administrative agency appeal initially and not an action at law for a refund. The second prong of Mercury's argument regarding deference given the Commission's prior position has some resonance at law as a general matter, *see Rendell v. Pa. State Ethics Comm'n*, 603 Pa. 292, 983 A.2d 708, 716 n. 8 (2009), but we see little relevance in application of the legal principle *sub judice*. Issues regarding the subject matter jurisdiction of the Commonwealth Court are not within the bailiwick of the Commission's expertise and are not generally entitled to deference in either case. *See Nationwide Ins. Co. v. Schneider*, 599 Pa. 131, 960 A.2d 442, 450 (2008) (*"Schneider"*) (ordinary rule of deference to agency's interpretation is premised on agency's regulatory expertise and is not applied where case does not involve issues within such expertise); *cf. Commonwealth v. Conklin*, 587 Pa. 140, 897 A.2d 1168, 1175 (2006) (issues of qualification to testify as expert generally rest within discretion of trial court; but, to extent that inquiry focuses upon meaning and application of statute governing bare minimum qualification of expert, Court's review is plenary and non-deferential). Accordingly, we perceive no impediment to addressing the merits of the jurisdictional claim raised by the Commission.

## III.

The dispositive inquiry here is whether the General Assembly intended an assessment dispute between a public utility and the Commission to proceed as an appeal or as a civil action at law in the Commonwealth Court. The parties' underlying controversy belongs to a general class of cases in which an entity regulated by a Commonwealth agency challenges the quasi-judicial determination of objections to the agency's regulatory action. *See* 66 Pa.C.S. § 510(a)-(d). While there is no dispute that the Commonwealth Court is the proper tribunal to first determine judicial controversies in this general class, an issue remains as to whether that court is authorized to decide these cases as matters on appeal or as actions at law commenced originally in the Commonwealth Court, where an appeal as of right would be lodged on this Court's docket.

 This issue is jurisdictional in nature because it implicates the competency of the Commonwealth Court to decide the general class of cases to which the present dispute between Mercury and the Commission belongs. *Vine v. Commonwealth, State Employees' Retirement Bd.*, 607 Pa. 648, 9 A.3d 1150, 1165 (2010) (jurisdiction relates to competency of tribunal to determine controversies of general class to which case belongs). "Jurisdiction over the subject matter is conferred solely by the Constitution and laws of the Commonwealth." *In re Administrative Order No. 1–MD–2003, Appeal of Troutman*, 594 Pa. 346, 936 A.2d 1, 5 (2007). Here, the jurisdiction of the Commonwealth Court is governed by statute and is a matter of statutory interpretation. The jurisdictional question is, therefore, subject to this Court's *de novo* review; the scope of review is plenary. *Commonwealth, Dep't of Envtl. Prot. v. Cromwell Township*, 32 A.3d 639, 646 (2011).

## IV.

██ As the parties correctly develop, this matter requires primarily construction of the following statutory provisions: Section 763 of the Judicial Code, Section 510 of the Public

Utility Code, and Sections 701 and 106 of the Administrative Agency Law. "[S]tatutes which relate to the same persons or things" are *in pari materia* and "must be construed together as one statute." *Bd. of Revision of Taxes v. City of Philadelphia,* 607 Pa. 104, 4 A.3d 610, 622 (2010) (citing 1 Pa.C.S. § 1932). If and to the extent to which the relevant statutes are irreconcilable, the legislative act latest in date of final enactment is to prevail. *See* 1 Pa.C.S. §§ 1935, 1936. An amendment to a provision of an act is "construed as merging into the original statute, becom[ing] a part thereof, and replac[ing] the part amended, and the remainder of the original statute and the amendment shall be read together and viewed as one statute passed at one time." 1 Pa.C.S. § 1953. The "portions of the statute which were not altered by the amendment shall be construed as effective from the time of their original enactment." *Id.*

The object of statutory construction is to ascertain and effectuate the General Assembly's intent. The plain language of a statute is, as a general rule, the best indicator of such legislative intent. *Bd. of Revision of Taxes,* 4 A.3d at 622 (citing 1 Pa.C.S. § 1921(a)). This general rule is subject to several important qualifications, including the precept that the General Assembly "does not intend a result that is absurd, impossible of execution, or unreasonable." *Commonwealth v. Shiffler,* 583 Pa. 478, 879 A.2d 185, 189–90 (2005) (alternative construction of seemingly clear mandatory sentencing provision warranted to avoid absurd incongruity with graduated sentencing scheme) (citing 1 Pa.C.S. § 1922(1), (2)). Equally favored presumptions are that the General Assembly does not intend to violate the Constitution of the Commonwealth, and that it "intends to favor the public interest as against any private interest." 1 Pa.C.S. § 1922(3), (5). We may look beyond the language of the statute if the plain meaning would lead to such results.

Similarly, if the words of a statute are not explicit but are unclear or ambiguous, we resort to considerations other than the plain language to discern legislative intent. *Com-*

*monwealth v. Garzone,* —— Pa. ——, 34 A.3d 67, 75 (2012) (citing 1 Pa.C.S. § 1922; *Commonwealth v. Diodoro,* 601 Pa. 6, 970 A.2d 1100, 1106 (2009)). Among the matters we may consider are: the occasion and necessity for the statute; the circumstances under which the statute was enacted; the mischief to be remedied; the object to be attained; the consequences of a particular interpretation; the contemporaneous legislative history; and the legislative and administrative interpretations of such statute. 1 Pa.C.S. § 1921(c).

## V.

The Commonwealth Court is a hybrid court, hearing some matters as a court of original jurisdiction and others in its appellate jurisdiction. The Judicial Code thus confines the jurisdiction of the Commonwealth Court to certain appeals from governmental agencies and courts of common pleas, and to certain matters commenced in the Commonwealth Court itself. *See* 42 Pa.C.S. §§ 761–764. In relevant part, the Judicial Code states that "the Commonwealth Court shall have exclusive jurisdiction of appeals from final orders of government agencies in the following cases: [a]ll appeals from Commonwealth agencies under Subchapter A of Chapter 7 of [the AAL] ... including appeals from ... the Pennsylvania Public Utility Commission...." 42 Pa.C.S. § 763(a)(1) (citing 2 Pa. C.S. §§ 701–704).[4] An appeal includes a proceeding on petition for review, and is defined generally as any application to a court for review of a subordinate governmental determination. *See* 42 Pa.C.S. § 102 ("Appeal"). In parallel, the Commonwealth Court has original jurisdiction over all civil actions against the Commonwealth government and over any civil actions, "[o]riginal jurisdiction of which is vested in the Com-

4. The Public Utility Commission is a Commonwealth agency for the purposes of jurisdiction. Thus, according to the Public Utility Code, the Commission was established and continues as "an independent administrative commission." 66 Pa.C.S. § 301(a). An independent administrative commission is a Commonwealth agency for the purposes of the Judicial Code, which governs the jurisdiction of the Commonwealth Court. 42 Pa.C.S. § 102 ("Commonwealth agency," "Independent agency"); *accord* 42 Pa.C.S. § 763(a).

monwealth Court by any statute hereafter enacted." 42 Pa. C.S. § 761(a)(1), (4). A civil action includes any action at law. *See* 42 Pa.C.S. § 102 ("Action").

The Pennsylvania Constitution guarantees the right to an "appeal ... from an administrative agency to a court of record or to an appellate court, the selection of such court to be as provided by law." PA. CONST. art. V, § 9. As the Judicial Code explicitly provides, the AAL, Subchapter A of Chapter 7, governs review of final orders in appeals from the Public Utility Commission generally, with the sole *caveat* that an action at law may be available if created by a statute enacted after the Judicial Code. *See* 42 Pa.C.S. §§ 761, 763(a). Chapter 7, Subchapter A, of the AAL—Sections 701 through 704— generally addresses judicial review of all Commonwealth agency actions. Specifically, Sections 703 and 704 describe the review process, commonly associated with an appeal, as follows: the scope of review is limited to issues preserved during agency proceedings; the matter is decided by the court without a jury, on the record certified by the agency; and the standard of review is deferential to the agency. Section 702 defers to the Judicial Code respecting the choice of forum for these appeals, *i.e.*, Commonwealth Court or common pleas courts. 2 Pa.C.S. § 702; *see, e.g.*, 42 Pa.C.S. §§ 763, 933.

Section 701 sets forth the general rule that Sections 701 through 704 apply "to all Commonwealth agencies." 2 Pa.C.S. § 701(a). An appeal pursuant to the AAL's judicial review provisions is available, "regardless of the fact that a statute expressly provides that there shall be no appeal from an adjudication of an agency, or that the adjudication of an agency shall be final or conclusive, or shall not be subject to review." *Id.* The AAL exempts some agencies from the provisions addressing judicial review, but the Public Utility Commission is not among these exempted agencies. *See* 2 Pa.C.S. § 501(b). As an interpretive matter, the AAL is presumed to survive subsequent statutory procedural innovations absent an express legislative directive otherwise: "[n]o subsequent statute shall be held to supersede or modify the

provisions of this title except to the extent that such statute shall do so expressly." 2 Pa.C.S. § 106.

Viewed in isolation, Section 510(d) of the Public Utility Code would seem to establish an exemption from the judicial review proceedings of the AAL, by creating an action at law by which public utilities may recover from the Commonwealth the entire or part of the annual operations fee that the Commission charged. Section 510(d) states:

> Suits by public utilities.—... Any public utility making [an assessment payment per subsection (c)] may, at any time within two years from the date of payment, sue the Commonwealth in an action at law to recover the amount paid, or any part thereof, upon the ground that the assessment was excessive, erroneous, unlawful, or invalid, in whole or in part, provided objections, as [provided in subsection (c)], were filed with the [C]ommission, and payment of the assessment was made under protest either as to all or part thereof....

66 Pa.C.S. § 510(d). For the purposes of such a suit, the Commission's findings of fact related to the determination of the public utility's objections, as well as any records relating to the Commission's regulatory expenses are "prima facie evidence of the facts therein stated." *Id.* But, the public utility may raise every relevant issue of law, and if the Commonwealth Court determines that "all or any part of the assessment for which payment was made under protest was excessive, erroneous, unlawful, or invalid," the utility is entitled to a refund from the Commission. *Id.*

According to Section 510(e), "[t]he provisions of this part relating to the judicial review of orders and determinations of the [C]ommission shall not be applicable to any findings, determinations, or assessments made under this section." 66 Pa.C.S. § 510(e). Rather, the procedure in Section 510, "providing for the determination of the lawfulness of assessments and the recovery back of payments made pursuant to such assessment[,] shall be exclusive of all other remedies and procedures." *Id.*

The difficulty here is in the tension between Section 763(a)(1) of the Judicial Code, which specifically authorizes appeals from final orders of the Commission pursuant to the AAL, and Section 510(d) of the Public Utility Code, which designates an exclusive remedy for challenging the Commission's assessment decisions—an action at law for a refund. Moreover, as the Commission notes, Section 510(d)-(e) forecloses any right to an appeal from the Commission's assessment decision and, as a result, is in tension with the mandate of the Pennsylvania Constitution regarding the right of appeal from an administrative agency to a court of law. Of course, we will presume that the General Assembly did not intend either to violate the Constitution or to achieve a result that is unreasonable or impossible of execution. *See* 1 Pa.C.S. § 1922(1), (3). Yet, a plain language interpretation would lead to these results. Accordingly, we turn to relevant rules of statutory construction to accomplish our task of effectuating the intent of the General Assembly.

## VI.

Preliminarily, we note that the Commonwealth Court is a constitutional entity whose jurisdiction is defined by statute. *See* PA. CONST. art. V, § 4. The creation of the court was part of a number of changes proposed by the Constitutional Convention of 1967–68 and approved by Pennsylvania voters in April 1968. *See* Bonnie Brigance Leadbetter & Daniel R. Schuckers, *Introduction to Articles Concerning the Contribution of the Commonwealth Court to Pennsylvania Jurisprudence since 1970*, 20 Widener L.J. 1, 1 (2010). The General Assembly implemented this constitutional amendment by adopting the Commonwealth Court Act of 1970. *See* 17 P.S. § 211.1 *et seq.* (Act 185 of January 6, 1970, P.L. 434, *as amended* ) (repealed). The original seven judges of the Commonwealth Court were appointed by Governor Raymond Shafer and confirmed by the Senate in early 1970. The court's investiture took place in Harrisburg on April 15, 1970. Leadbetter, at 1.

Shortly thereafter, the General Assembly adopted the Appellate Court Jurisdiction Act of 1970, which delineated the jurisdiction of the newly created court. *See* 17 P.S. §§ 211.401 *et seq.* (Act 223 of July 31, 1970, P.L. 673, *as amended*) (repealed). This act transferred jurisdiction from the Superior Court to the Commonwealth Court over appeals from administrative agencies, and created the original jurisdiction of the Commonwealth Court. *See Bronson v. Bd. of Probation and Parole,* 491 Pa. 549, 421 A.2d 1021, 1024–25 (1980) (citing 17 P.S. §§ 211.401, 211.403 (Act 223, *supra,* §§ 401, 403) (repealed)); *Abramson v. Pub. Util. Comm'n,* 489 Pa. 267, 414 A.2d 60, 63 n. 8 (1980) (same). As of June 27, 1978, the Appellate Court Jurisdiction Act of 1970 was repealed by the Judiciary Act Repealer Act (Act 53 of April 28, 1978, P.L. 202), but two of its provisions were reenacted and codified as Sections 761 and 763 of the Judicial Code, which currently describe the jurisdiction of the Commonwealth Court. *See* 42 Pa.C.S. §§ 761, 763 (Act 142 of July 9, 1976, P.L. 586, *effective* June 27, 1978).

Section 9 of Article V, which guarantees the right to appeal from agency adjudications, was another constitutional provision approved by Pennsylvania voters in 1968. *See* Pa. Const. art. V, § 9. This provision "introduced a new concept to Pennsylvania jurisprudence, one which recognized the important position of administrative agencies in modern government, the quasi-judicial functions that many of them perform, and the fact that both property rights and personal rights can be seriously affected by their decisions." *Rogers v. Pa. Bd. of Probation & Parole,* 555 Pa. 285, 724 A.2d 319, 321–22 (1999) (quoting *Bowers,* 269 A.2d at 715). Article V, Section 9 was not self-executing and the General Assembly amended the then-existing Administrative Agency Law effective in 1969, to implement the new constitutional provision. *See id.* (citing 71 P.S. § 1710.10 *et seq.* (Act 442 of June 4, 1945, P.L. 1388), as amended by Act 354 of Dec. 2, 1968, P.L. 1135, *effective* Jan. 1, 1969 (repealed)).

The amendment to the existing AAL represented by Act 354 created a modicum of order respecting the availability of

judicial review in the administrative agency arena by clarifying and expanding the applicability of the AAL. Section 51 of Act 354 listed the agencies to which the AAL applied, and Section 50 described the exceptions. Section 47 introduced the AAL's appeal process "[w]here an Act of Assembly expressly provides that there shall be no appeal from an adjudication of an agency" or other similar formulations with that intent. Meanwhile, Section 46 exempted from the AAL's uniform provisions any adjudication which was subject to review pursuant to a different statute. *See* 71 P.S. §§ 1710.46, 1710.47, 1710.50, 1710.51 (repealed). The agency appeal process remained, nonetheless, subject to a pastiche of statutory clauses and judicial procedures until 1978. *See, e.g., Conestoga Nat'l Bank of Lancaster v. Patterson*, 442 Pa. 289, 275 A.2d 6, 13 n. 11 (1971); *accord* Pa.R.A.P. 1502 & note ("Exclusive procedure" rule, initially adopted in 1975 and amended in 1978, created "petition for review" pleading to substitute "for all of the prior types of pleading which seek relief from a governmental determination").

In 1978, the General Assembly substantially reenacted and codified the AAL, as it had been amended by Act 354. *See* 2 Pa.C.S. § 101 *et seq.* (Act 53 of April 28, 1978, P.L. 202, *effective* June 27, 1978). Title 2—the current AAL—differed from its predecessor in the scope of its applicability: where the earlier AAL applied only to enumerated governmental agencies, the AAL is now presumed to apply to all Commonwealth agencies, except where the agency is expressly exempted. *Compare* 71 P.S. § 1710.51 (repealed) *with* 2 Pa.C.S. § 701. Section 701 of the AAL, which describes the broad applicability of the AAL, was derived from Sections 46, 47, 50, and 51 of Act 354. The intended broad application of the AAL affected other statutes in material part and required their adjustment.[5]

5. By comparison, the remaining provisions of Chapter 7, Subchapter A of Title 2—Sections 702–704—were substantial reenactments of the AAL's predecessor, with minor modifications to account for the creation of the Commonwealth Court and for the codification of various legislative acts. *See* 71 P.S. §§ 1710.41–1710.42, 1710.44 (Act 442 of June 4, 1945, P.L. 1388, *as amended* ) (repealed); *Dep't of Envtl. Res. v.*

Notably, while the Public Utility Commission's final orders are now explicitly subject to the judicial review process of the AAL, *see* 42 Pa.C.S. § 763, the AAL's prior iteration listing enumerated agencies did not govern judicial review of the Commission's actions prior to 1978. *See Suburban Lines, Inc. v. Pa. Pub. Util. Comm'n,* 32 Pa.Cmwlth. 95, 377 A.2d 1282, 1284 (1977); *City of Pittsburgh v. Pa. Pub. Util. Comm'n,* 3 Pa.Cmwlth. 546, 284 A.2d 808, 809–11 (1971). Rather, actions of the Commission, including assessment decisions, could be challenged in court as provided by the Public Utility Law, the predecessor of the Public Utility Code. *Abramson,* 414 A.2d at 62 n. 4; *see Pennsylvania R.R. Co. v. Pa. Pub. Util. Comm'n,* 396 Pa. 34, 152 A.2d 422, 423–24 (1959) (citing 66 P.S. § 1431(a) (repealed)); *see also* 66 P.S. § 1461 (repealed).

Then, the Public Utility Law was repealed *in toto* in 1978. *See* 66 P.S. § 1101 *et seq.* (Act 286 of May 28, 1937, P.L. 1053, *as amended* ) (repealed). Parts of the earlier law were reenacted and codified in the Public Utility Code. *See* 66 Pa.C.S. § 101 *et seq.* (Act 116 of July 1, 1978, P.L. 598, *effective* in 60 days). In relevant part, Section 1201 of the Public Utility Law was originally enacted in 1937 and was, subsequently, codified as Section 510 of the Public Utility Code, with amendments that accounted for cross-references among various Code provisions. *Compare* 66 P.S. § 1461 (repealed) *with* 66 Pa. C.S. § 510; *see Branch Motor Express Co. v. Commonwealth,* 69 Pa. D. & C. 377, 383–84 (Pa.Com.Pl.Ct.1950) (quoting 66 P.S. § 1461 (repealed)), *Bradford Electric Co. v. Driscoll,* 35 Pa. D. & C. 312 (Pa.Com.Pl.Ct.1939) (same). Other provisions were omitted, however, including those that addressed judicial review of other Commission actions. *See, e.g.,* 66 P.S. § 1431(a) (repealed) ("Within thirty days after the service of any order by the commission ... any party to the proceedings affected thereby may appeal therefrom to the Superior Court.").[6]

*Wolford,* 16 Pa.Cmwlth. 254, 329 A.2d 304, 305 (1974) (quoting 71 P.S. § 1710.41); *Arsenal Coal Co. v. Dep't of Envtl. Res.,* 505 Pa. 198, 477 A.2d 1333, 1338 (1984) (quoting 71 P.S. § 1710.42); *State Dental Council & Examining Bd. v. Friedman,* 27 Pa.Cmwlth. 546, 367 A.2d 363, 365 n. 4 (1976) (quoting 71 P.S. § 1710.44).

## VII.

A recounting of this background serves to clarify the order in which the relevant statutes were adopted for the purposes of statutory construction. Moreover, the history provides perspective on the evolving statutory scheme crafted by the General Assembly and the roles that Section 701(a) of the AAL and Section 510(d)-(e) of the Public Utility Code play within the context of Section 763(a) of the Judicial Code governing the appellate jurisdiction of the Commonwealth Court.

Initially, we are persuaded that the Judicial Code/AAL scheme and the Public Utility Code's Section 510(d)-(e), read *in pari materia*, are in irreconcilable conflict for the purposes of applying the rules of statutory construction. Sections 763(a)(1) of the Judicial Code and 701(a) of the AAL, construed together as one statute, provide for judicial review of assessment adjudications, while Section 510(d)-(e) of the Public Utility Code states that an action at law for a refund in the original jurisdiction of the Commonwealth Court is the **exclusive** procedure by which to challenge a Commission's assessment decision. The legislative schemes cannot apply at the same time and are fundamentally antagonistic. Rules of construction dictate that the legislative act with the latest date of final enactment is to prevail. *See* 1 Pa.C.S. §§ 1935, 1936.

---

**6.** In addition to implementing new mandates of the Constitution, the 1978 process of repeal and partial reenactment of the several acts was also part of the General Assembly's advance in the 1970s toward a general code, known as the Pennsylvania Consolidated Statutes. The original efforts were aimed at creating a "framework . . . contemplated to contain all of the Commonwealth's statutory laws." *See City of Philadelphia v. Commonwealth*, 922 A.2d 1, 11 (Pa.Cmwlth.2003). Since then, the General Assembly has codified other acts and has created other titles, but has yet to achieve its ultimate goal of complete consolidation. *Id.; see, e.g., Germantown Cab Co. v. Phila. Parking Auth.*, 614 Pa. 133, 36 A.3d 105, 116–18 (2012) (General Assembly contemplated repositing unconsolidated portion of Commonwealth Documents Law in Chapter 3 of Title 2, which presently remains empty and "reserved").

Section 763 of the Judicial Code and Section 701 of the AAL, which embodied the new understanding regarding the importance of the administrative process in the Commonwealth's jurisprudence, were newly-adopted and effective as of June 27, 1978. The relevant "portions" of Section 510 of the Public Utility Code predate the enactment of these Judicial Code and AAL provisions. Thus, as originally enacted in 1937, the Public Utility Law provision created the action at law for a refund now codified word-for-word in the Public Utility Code at Section 510(d). *Compare* 66 P.S. § 1461(d) (repealed) *with* 66 Pa.C.S. § 510(d). When reenacted on July 1, 1978, Section 510(d) was modified only insofar as the provision referred to the source from which a refund would be available. Meanwhile, Section 510(e) (which addresses exclusivity) was originally enacted in 1937 and recodified in its totality in 1978. *Compare* 66 P.S. § 1461(e) (repealed) *with* 66 Pa.C.S. § 510(e).

Notably, the Statutory Construction Act provides that the "portions of the statute which were not altered by the amendment shall be construed as effective from the time of their original enactment." 1 Pa.C.S. § 1953. Thus, in this case, the relevant portions of Section 510 are construed as effective since 1937, pre-dating by a half century Sections 763 of the Judicial Code and 701 of the AAL. As the legislative act latest in date of final enactment, the Judicial Code/AAL scheme prevails. *See* 1 Pa.C.S. § 1936. Thus, as a matter of statutory construction, we conclude that the AAL provides the appropriate process by which a decision of the Commission may be challenged in court, to the exclusion of Section 510, subsections (d) and (e), of the Public Utility Code, provisions representing a now-antiquated administrative schemata. Accordingly, we agree with the Commission that the appropriate process of judicial review of its adjudications in assessment matters is via a direct appeal to the Commonwealth Court.

## VIII.

Implicit in Mercury's contrary argument is that Section 510(d)-(e) may be construed as an exception to the AAL's

process of judicial review, applicable only to assessment matters. As noted, Section 701 of the AAL states that a right to appeal is available irrespective of whether "a statute expressly provides that there shall be no appeal from an adjudication of an agency." 2 Pa.C.S. § 701. As this Court has explained, in drafting the AAL, the General Assembly "expressly contemplate[d] that other statutes will differ insofar as appellate rights are concerned, and it expresse[d] explicit legislative intent that [the AAL] shall prevail." *Mar. Mgmt.*, 611 A.2d at 205.[7] The AAL provides that a subsequent statute supersedes this provision only "to the extent that such statute shall do so **expressly.**" 2 Pa.C.S. § 106 (emphasis added). Here, leaving aside temporal considerations concerning when statutes were enacted—an endeavor complicated by the amendments to the AAL and the Public Utility Law which we have already outlined—Section 510(d)-(e) would seemingly foreclose an appeal from a Section 510(c) assessment adjudication. Further analysis of the relevant statutes, however, which must include the temporal issue, persuades us that this is not a proper construction.

Section 510(e) provides:

Certain provisions not applicable.—The provisions of this part relating to the judicial review of orders and determinations of the [C]ommission shall not be applicable to any findings, determinations, or assessments made under this section. The procedure in this section providing for the determination of the lawfulness of assessments and the

---

7. In *Maritime Management*, this Court reversed the Commonwealth Court's quashal of the appeal of a liquor licensee from a decision of the Pennsylvania Liquor Control Board. The Court held that Section 701 of the AAL created a right of appeal, regardless of the prohibition against appeal in Section 408(b) of the Liquor Code. 611 A.2d at 205 (citing 47 P.S. § 4-408(b)). Notwithstanding the broad language quoted in the text, we do not overstate the applicability of the decision, however. We recognize that the language of Section 408 of the Liquor Code differs significantly from that of Section 510(d)-(e) of the Public Utility Code. Specifically, Section 510(e) states that an action at law for a refund, pursuant to Section 510(d), is the exclusive means by which an assessment decision may be challenged in court, while Section 408 of the Liquor Code neither offers an alternate review process nor addresses exclusivity. The *Maritime Management* Court held that no conflict existed between the Liquor Code and the AAL provisions. *Id.*

recovery back of payments made pursuant to such assessment shall be exclusive of all other remedies and procedures.

66 Pa.C.S. § 510(e). As an initial matter, we note that the exemption from the provisions "of this part" respecting "the judicial review of orders and determinations of the [C]ommission" refers to Subpart B of Chapter 5 of the Public Utility Code. *See* 66 Pa.C.S. § 501 *et seq.* Any interpretation of this clause as an oblique reference to the Administrative Agency Law is simply unreasonable.

At best, the exclusivity language of Section 510(e) is susceptible to an interpretation suggesting an exemption from judicial review procedures applicable to the Commission in other circumstances, under the AAL. But, the relevant portions of Section 510 were neither subsequently enacted, nor can the plain language be construed as intended to "expressly" supersede the judicial review provisions of the AAL. *See* 2 Pa.C.S. § 106. "[A]n ambiguity is not tantamount to an express exemption," and any suggestion that Section 510(e) may be construed as a "derivative exemption" must be rejected. *Germantown Cab Co. v. Phila. Parking Auth.*, 614 Pa. 133, 36 A.3d 105, 119 (2012) (interpreting 45 Pa.C.S. § 508, the Commonwealth Documents Law counterpart to Section 106).

Moreover, application of the AAL in the assessment context is compatible with the objects that the 1968 constitutional amendments and General Assembly sought to attain: access to courts, uniformity, and efficiency. The result of construing Section 510(e), language merely carried over from the old Public Utility Law in 1978, as if it were an expressly-intended exception to the AAL's scheme, and therefore affirming the Commonwealth Court, is untenable.

Furthermore, foreclosing judicial review of a Commission's assessment decision would create a review scheme in tension with the constitutionally-guaranteed right to an appeal from an administrative agency's final order. *See* PA. CONST. art. V, § 9. The right to an appeal was intended to grant access to courts for the review of agency adjudications which, as we

have explained, can seriously affect both property rights and personal rights. *See Rogers,* 724 A.2d at 321–22. Exclusive redress via an action at law for a refund is not an equivalent alternative to an appeal for either a utility or the Commission. For example, Section 510(d)-(e) forecloses any judicial review at all if the Commission is the aggrieved party. To the extent that the provision permits a form of judicial review for an aggrieved utility, the utility may challenge the assessment only on limited grounds, if the assessment is "excessive, erroneous, unlawful, or invalid." *See* 66 Pa.C.S. § 510(d). Procedural or constitutional due process challenges relating to the administrative proceedings, which may be proper in an appeal, are not available in an action at law for a refund. *Id.* The truncated review afforded by the Public Utility Code enforces an "administrative absolutism" from which the 1968 Constitution departed, and which the General Assembly sought to correct in adopting the broadly applicable AAL. *Cf. In re El Rancho Grande, Inc.,* 496 Pa. 496, 437 A.2d 1150, 1154 (1981).

The distinct Section 510(d) process also departs from the generally uniform procedure that the General Assembly sought to implement with the restructuring of the AAL following the 1968 adoption of Section 9 of Article V of the Constitution. The General Assembly's global approach to "prioritize[ ] regularity and formality" in agency action is evident in Sections 106 and 701 of the AAL, *supra,* which both extend the reach of the AAL and require that any departure from the AAL scheme be express. *See Germantown Cab,* 36 A.3d at 120. Section 510(d)-(e) offers a judicial review process which neither fits within current expectations in administrative proceedings nor offers the benefits of the regularly employed procedure.

The Commission is obligated, to be sure, to ensure that agency-level proceedings comply with due process (at a cost passed on to utilities), see *Kowenhoven,* 901 A.2d at 1009–10. But, Section 510(d)-(e), if deemed applicable, would diminish the utility of these proceedings by requiring *de novo* review in the Commonwealth Court; in the regular course of an agency

appeal, an agency decision is afforded the benefit of deferential review, in recognition of the agency's expertise. *See Popowsky v. Pa. Pub. Utility*, 550 Pa. 449, 706 A.2d 1197, 1203 (1997). Moreover, unlike an appeal conducted on the record certified by the Commonwealth agency, *see* 2 Pa.C.S. § 704, the Section 510(d) action at law for a refund permits the parties to introduce evidence and commence proceedings anew, pointlessly duplicating the proceedings before the Commission and increasing the cost of litigation.

The General Assembly signaled its intent to avoid these results by adopting Section 708(e) of the Judicial Code, effective June 27, 1978, which stated that review of a determination of a government unit is to proceed via a single action, generally an appeal to the Commonwealth Court, except where such relief is not appropriate. *See* 42 Pa.C.S. § 708(e). This Court agreed with the General Assembly's chosen course and curtailed the availability of the several original jurisdiction forms of action (*i.e.*, equity, replevin, etc.) available at common law as they related to matters within the scope of a petition for review of governmental determinations. *See* Pa.R.A.P. 1502 & note. The Court explained in a subsequent case that forms of action similar to that of Section 510(d) "are in the nature of a review of government action." *Lindberg*, 469 A.2d at 1016 (citing Pa.R.A.P. 1502). And, the Court recognized that "the statutory appellate remedy is today the norm and the use of an original action in such matters is the exception." *Id.; cf. Elgin v. Dep't of Treasury*, —— U.S. ——, ——, 132 S.Ct. 2126, 2135, 183 L.Ed.2d 1 (2012) (integrated scheme of administrative and judicial review was designed to replace outdated patchwork of statutes and rules causing wide variations in kinds of decisions issued on same or similar matters, and double layer of judicial review that was wasteful and irrational).

Finally, it is worth noting that the AAL process better serves the intent of the General Assembly that each public utility is to "advance to the [C]ommission its reasonable share of the cost of administering [the Public Utility Code]." 66 Pa.C.S. § 510(f). As the Commission explains, Section 510(d)

permits a utility to delay challenging the Commission's assessment decision by up to two years. *See* 66 Pa.C.S. § 510(d) (utility may sue for refund "at any time within two years from the date of payment"). Within the AAL process, however, the utility is required to appeal an assessment adjudication within thirty days after its entry, a process which permits assessment disputes to proceed to finality within a much shorter timeframe. Pa.R.A.P. 1512(a); *see* 42 Pa.C.S. § 5571(a) (time for filing an appeal is governed by general rules). In light of the structure based upon which the yearly assessment is calculated for each utility, proceeding under Section 510(d) creates greater delay and uncertainty regarding the Commission's assessment revenues and liabilities to cover the cost of administering the Public Utility Code, to the detriment of other utilities and the public. Thus, the appeal process protects the public interest and, indeed, does not appear to be at odds with any private interest other than the litigation posture of the present appellee.

Against this landscape, Section 510(d)-(e) appears to be a vestigial remnant of the repealed Public Utility Law, perhaps the result of a drafting oversight in a complicated recodification process.[8] The Section 510(d) process substituted, until the adoption of the AAL's uniform procedures, as judicial review of the Commission's decisions. But, where, as here, an appeal is available and adequate, "resort to original jurisdiction is not available." *Lindberg*, 469 A.2d at 1017.[9]

8. A telling indication that Section 510(d)-(e) may represent an oversight is that Section 510(e) purports to exempt assessment decisions from the judicial review process "of this part," *i.e.*, of the Public Utility Code. But, that judicial review process was omitted from the Code during reenactment and codification. *See* 66 Pa.C.S. § 101 *et seq.; accord* Act 116 of July 1, 1978, P.L. 598 (repealing, *inter alia*, 66 P.S. § 1431(a)).

9. The Court elaborated on this holding in *O'Brien v. Commonwealth, State Employes' Retirement Sys.*, 503 Pa. 414, 469 A.2d 1008 (1983), a decision rendered simultaneously with *Lindberg*. In *O'Brien*, the Court declined to interpret Sections 761 and 763 of the Judicial Code as permitting collateral review of agency determinations via actions at law filed in the original jurisdiction of the Commonwealth Court; such review, the Court held, is addressed to the appellate jurisdiction of that court, "as a matter of statutory interpretation." *Id.* at 1011. The Court recounted the protracted and repetitive attempts of appellant to mount

As a result of these considerations, we agree with the Commission that the General Assembly intended that Section 510(c) adjudications of the Commission be appealable as of right, irrespective of the procedure delineated in Section 510(d). The Commonwealth Court is competent to review Mercury's petition only in its appellate jurisdiction.

### B. Supreme Court Process: Direct Appeal or Discretionary Appeal

■■■ As a second issue on appeal, we requested briefing and argument from the parties on the issue of whether, as a general matter, review by this Court in assessment cases is of right or by allowance. The transferring panel below did not directly address the question, but the necessary consequence of a transfer to the Commonwealth Court's original jurisdiction is that a party aggrieved by the ensuing decision in an assessment matter is entitled to an appeal as of right to this Court. *See* PA. CONST. art. V, § 9 ("there shall also be a right of appeal from a court of record ... to an appellate court, the selection of such court to be as provided by law"); 42 Pa.C.S. § 723.

The Commission disagrees and argues that judicial review by this Court is discretionary in assessment matters. Commission's Brief at 20 (citing 42 Pa.C.S. § 724(a)). According to the Commission, assessment matters are commenced before the agency, are subject to direct review in the Commonwealth Court, and any subsequent review is available via petition for allowance of appeal in this Court. Mercury responds with a narrow argument relevant only in the transfer paradigm, and does not address the nature of the judicial review process in this Court generally. Where, as here, the matter was transferred to the Commonwealth Court's original jurisdiction, Mercury claims there is no dispute that the case was commenced in that court. Mercury's Brief at 17–18 (citing *Stackhouse v. Pa. State Police*, 574 Pa. 558, 832 A.2d 1004 (2003)). On this basis, Mercury distinguishes our Opinion Announcing

the collateral attack, and emphasized the salutary purpose of "economy of judicial resources" underlying its decision. *Id.*

the Judgment of the Court in *Lindberg*, 503 Pa. 423, 469 A.2d 1012. Mercury argues that any appeal would be as of right to this Court, pursuant to Section 723 of the Judicial Code. *See* 42 Pa.C.S. § 723.

This issue concerns the direct or discretionary nature of this Court's competency to decide the general class of cases to which the present dispute belongs and, as a result, is jurisdictional. *See Vine*, 9 A.3d at 1165. A jurisdictional question is subject to this Court's *de novo* review; the scope of review is plenary. *Cromwell Township*, 32 A.3d at 646.

Section 723 provides that "[t]he Supreme Court shall have exclusive jurisdiction of appeals from final orders of the Commonwealth Court entered in any matter which was **originally commenced** in the Commonwealth Court except an order entered in a matter which constitutes an appeal to the Commonwealth Court from ... another government unit." 42 Pa.C.S. § 723(a) (emphasis added). Section 724 of the Judicial Code governs all other requests for judicial review in this Court: "final orders of the Commonwealth Court not appealable under section 723 (relating to appeals from Commonwealth Court) may be reviewed by the Supreme Court upon allowance of appeal...." 42 Pa.C.S. § 724(a). Allowance of appeal pursuant to Section 724 is discretionary, subject to the considerations and procedures outlined in the Rules of Appellate Procedure. *Id.; see* Pa.R.A.P. 1111 *et seq.* If the petition for allowance of appeal is granted, the Supreme Court has jurisdiction to review the order of the Commonwealth Court under the scope and standard of review appropriate to the nature of the claim raised. 42 Pa.C.S. § 724(a). The key inquiry here is whether an assessment case originally commences in the Commonwealth Court or is in the nature of an appeal from a government unit.

We have explained in the first part of this decision that those portions of Section 510, subsections (d) and (e), which require a utility to file an action at law for a refund as the exclusive means of relief following the Commission's adjudication, are obsolete. Assessment matters, therefore, commence

with objections to the annual assessment filed with the Commission, an administrative agency. The Commission's adjudication of the objections is then subject to appeal as of right in the Commonwealth Court, by either aggrieved party; such an appeal vindicates the right guaranteed by Article V, Section 9 of the Constitution. Further judicial review is at this Court's discretion, and not as of right. 42 Pa.C.S. §§ 723, 724; *see O'Brien,* 469 A.2d at 1011–12; *Lindberg,* 469 A.2d at 1019.

## C. Judicial Process in the Matter before the Court

Separately, we also asked the parties to address how we should proceed with judicial review in this matter, in light of the reality of the transfer and review of this case in the Commonwealth Court's original jurisdiction. The Commission suggests that its appeal to this Court is direct, under Section 723 of the Judicial Code, so that the Commission may avail itself of the right guaranteed by Article V, Section 9 of our Constitution. The Commission would insulate this matter from the judicial review process applicable for the general class of assessment cases on the ground that the transfer of Mercury's petition for review to the original jurisdiction of the Commonwealth Court effectively means that this action "commenced" in that court—even though it should not have. Commission's Brief at 21 (citing *Stackhouse, supra*). The Commission also distinguishes *Lindberg, supra,* for a similar reason. "In this rare instance, it is the Commonwealth Court's own order which serves to expressly remove the matter from [that c]ourt's appellate jurisdiction. In cases where the Commonwealth Court transfers a matter to its original jurisdiction, a party has no alternative but to pursue an appeal of right...." *Id.* at 23–24.

Mercury agrees with the Commission's position on this issue, and reasserts the arguments it made with respect to the previous issue. Additionally, Mercury emphasizes that the Commission's position with respect to the second and third issues on appeal is inconsistent. The Commission, Mercury claims, recognizes the error of its discretionary appeal argument by its admission that the present dispute must proceed

in this Court under Section 723(a) of the Judicial Code. Mercury's Brief at 21–22.

Initially, we reiterate that the parties may not, by agreement, vest subject matter jurisdiction in a court which does not have it otherwise. *Bowers*, 269 A.2d at 715. We are required, therefore, to assess independently the nature of our competency to review the lower court's decision, notwithstanding the parties' agreement that direct review jurisdiction over this matter is proper under Section 723(a).

As we explained in the first two parts of this decision, as a general matter, an assessment case is originally commenced with the Commission. The Commission's adjudication is appealable as of right to the Commonwealth Court and, subsequently, by allowance to this Court. The dispute between Mercury and the Commission is no different, as it commenced before the administrative agency. The parties, however, seemingly view the Commonwealth Court's transfer order—which we have determined was erroneous—as determinative of the nature of this Court's jurisdiction over the matter. We disagree. A jurisdictional question does not turn upon the styling of claims within a petition for review nor, for that matter, upon the lower court's erroneous construction of the statute governing its jurisdiction. *See Stackhouse*, 832 A.2d at 1008; *O'Brien*, 469 A.2d at 1009; *Lindberg*, 469 A.2d at 1014.

This Court looks "to the substance rather than the form of the complaint to determine matters of jurisdiction." *Stackhouse*, 832 A.2d at 1009. The *O'Brien* and *Lindberg* decisions are illustrative. The *O'Brien* petitioner filed, in the Commonwealth Court's original jurisdiction, an action to compel a hearing by an administrative agency which had issued a final order to deny petitioner's request for a hearing. The Commonwealth Court declined to address jurisdiction, and denied petitioner relief. In *Lindberg*, the petitioner filed, in the original jurisdiction of the Commonwealth Court, a petition to enforce an agency order, which had been earlier affirmed by the Commonwealth Court on appeal. The Commonwealth Court granted the petitioner relief. In both cases, the ag-

grieved parties filed direct appeals to this Court, pursuant to Section 723 of the Judicial Code.

This Court examined the nature of the *O'Brien* and *Lindberg* claims and concluded that they involved judicial review of determinations of governmental units, rather than having the characteristics of original actions. *O'Brien*, 469 A.2d at 1011–12; *Lindberg*, 469 A.2d at 1017. "[W]hatever the parties may denominate the form of review," if "an appeal is available and adequate, resort to [the Commonwealth Court's] original jurisdiction is not available and appeal to this Court is not present as of right." *Lindberg*, 469 A.2d at 1017. This Court would have to exercise discretionary jurisdiction, under Section 724(a) of the Judicial Code, to reach the underlying claims. In both matters, the Court quashed the notices of appeal of the aggrieved parties, but proceeded to treat the notices as petitions for allowance of appeal, which were granted; the Court then reached the merits of each appeal and affirmed the decisions below.

■ Similarly, here, the core of Mercury's petition for review in the Commonwealth Court was a request for judicial review of the Commission's adjudication. Because an appeal is available and adequate under the AAL, resort to the Commonwealth Court's original jurisdiction was improper, even if the Commonwealth Court acted otherwise. A subsequent appeal from the Commonwealth Court's decision to this Court is not available as of right. As a result, we will quash the Commission's direct appeal.

In effect, this is an appeal "improvidently taken to the Supreme Court under [S]ection 723 in a case where the proper mode of review is by petition for allowance of appeal." In such a circumstance, and particularly because the Commission was placed in an untenable position by the Commonwealth Court's transfer order, we will regard and act upon the Commission's notice of appeal as upon a petition for allowance of appeal duly filed at the time the direct appeal was taken. 42 Pa.C.S. § 724(b); Pa.R.A.P. 1102. We hereby grant the

Commission's petition for allowance of appeal, thereby perfecting our jurisdiction.

### The Refund Request

#### I.

We now turn to address the remaining, substantive issue presented for review: whether, under a proper interpretation of Section 510(b)-(d) of the Public Utility Code, the Commonwealth Court erred in ordering a partial refund of Mercury's 2005 annual assessment.

The Commission claims its initial assessment concerning Mercury was correct as a matter of law. According to the Commission, the initial assessment was based upon a revenue estimate that was binding on Mercury, as a utility which had filed a report of its actual revenue for the prior calendar year only after the March 31 deadline. The Commission explains that the statutory scheme governing assessments is designed around actual revenues reported timely by utilities or, when such reports are not filed or are filed untimely, around binding estimations of revenues. The deadline for reporting revenue serves an important purpose. Each utility's assessment represents a portion of the Commission's annual costs dependent on a comparison of its revenue to revenues of other Commission-regulated utilities. "[T]he Commission must first have fixed revenue figures to begin the calculation" and, "[i]f a party were permitted to alter its revenue figure[, whether actual or estimated,] after the calculation is completed, the party would effectively be altering the assessment rate for all utilities." Commission's Brief at 25 (citing 66 Pa.C.S. § 510(b)).

To avoid the uncertainty, the Commission argues, the plain and unambiguous language of Section 510(b) makes clear the binding nature of revenue estimates in circumstances, like this one, where the utility fails to provide a timely account of its prior year's revenue. According to the Commission, Mercury is not entitled to relief based on its indisputably untimely filing of different revenue figures, even where these different

figures represented Mercury's actual revenue as compared to the Commission's inaccurate estimate. To the extent that Section 510(b) is subject to interpretation, the Commission declares that its administrative construction is "entitled to great deference and should not be reversed unless clearly erroneous." *Id.* at 27.

The Commission emphasizes that the issue before this Court is one of statutory construction and criticizes the Commonwealth Court for failing to engage in an analysis of Section 510, in favor of relying on a misinterpretation of the parties' stipulation. According to the Commission, the parties' stipulation of facts was limited to an agreement that if Mercury had filed its actual revenue report on time, the assessment would have been lower. But, the Commission stresses, it has "consistently maintained" throughout the proceeding that "the statute requires that [the Commission's] revenue estimate is binding [on Mercury]" and that the assessment resulting from employing the statutory formula is fixed by law. *Id.* at 27–28. Accordingly, the Commission contends that the Commonwealth Court erred in awarding Mercury a refund.

In response, Mercury asserts that the Commission's interpretation of Section 510(b) is irrelevant. Mercury claims that the sole inquiry here is focused on whether the utility proved in the Commonwealth Court that the Commission's assessment was in fact excessive, erroneous, unlawful, or invalid. In the utility's view, the *Mercury Trucking I* order vacating the Commission's administrative decision, and the *de novo* nature of the Commonwealth Court's subsequent decision in *Mercury Trucking III*, "render[ed] the Commission's interpretation of Section 510 meaningless." Mercury's Brief at 24. Accordingly, Mercury proceeds, first, by explaining why it believes the Commission's arguments are not aligned with the General Assembly's intent and, second, by explaining and applying its own construction of Section 510.

Mercury views the Commission's construction of the statute as essentially creating a "binding assessment" system, in which individual rates cannot be challenged because they disrupt the rate for all other utilities. According to Mercury,

this view of the statutory scheme is faulty because, by permitting objections to assessments, the legislative intent was to allow assessment revisions, which result in "a constantly changing assessment rate" occurring "naturally" when utilities exercise their right to object. Mercury states that it is challenging its so-called "binding assessment," and not the binding estimate, a distinction it believes is important because, "[w]hile the Commission is correct that its estimate of Mercury's revenues is 'binding' and [cannot] be challenged under Section 510(b), the assessment based on the Commission's estimate is clearly not binding and remains subject to a utility's right to file objections...." *Id.* at 26. According to Mercury, the ability to file objections (and the availability of an action at law for a refund) is a clear indicator that the General Assembly did not intend for the assessment to be binding. Mercury argues that, if we adopt the interpretation offered by the Commission, then its rights to file objections and an action at law will be violated.

The utility suggests that, because the Commission's construction of the Section 510(b) language regarding the "binding" nature of a revenue estimate is inconsistent with the rights conferred by Section 510(c)-(d) (*i.e.*, to file objections and an action at law), that construction creates an ambiguity in the statutory scheme. The ambiguity can be resolved, Mercury suggests, by allowing the utility to challenge its assessment derived from the estimated revenue based on evidence of its actual revenue, if the utility can prove that the assessment is excessive, erroneous, unlawful, or invalid— grounds enumerated in Section 510(c)-(d). Here, the utility states, Mercury followed the appropriate administrative procedure and proved that the estimated revenues were "substantially more than" its actual revenues. *Id.* at 27. Mercury claims that, as a result, the assessment was excessive and Mercury was entitled to the refund ordered by the Commonwealth Court exercising *de novo* review of its claim.

Consideration of the views of the tribunals below on this question is helpful. Addressing Mercury's objections to the assessment in the first instance, the ALJ assigned by the

Commission recommended a refund. The ALJ adopted Mercury's interpretation of the statute and concluded that, if he were to accept the Commission's construction, then the General Assembly's intent to permit objections and create an action at law for a refund would be thwarted. According to the ALJ, the estimated revenue is binding "assuming the utility does not file objections to the Commission's assessment," but the binding estimate requirement "does not apply" whenever a timely objection is filed under Section 510(c). ALJ's Initial Decision, 2/14/2006, at 6–7 (emphasis omitted). A contrary interpretation, the ALJ stated, "would deny Mercury its due process right to a hearing to contest the Commission's estimate." *Id.*

Sitting in its administrative review capacity, the Commission rejected the ALJ's recommendation and reversed, granting the exceptions filed by its prosecutory staff. The Commission explained that Mercury sought a refund "based on the differential between its actual, as compared to [the] estimated, revenues used in the Commission's assessment calculations." Commission's Opinion, 5/22/2006, at 5. According to the Commission, Mercury's failure to file a timely revenue report operated "as a bar to the utility seeking to overturn [its] assessment based on a challenge to the revenue estimate"; Section 510(b) was clear and unambiguous in this regard. *Id.* at 11. The Commission stated that Sections 510(b) and 510(c) were not in conflict because, while a utility is bound by the Commission's estimate and cannot obtain relief on that issue, the utility is not precluded otherwise from pursuing claims in the form of objections to the assessment. Last, the Commission rejected Mercury's equitable arguments regarding the substantial overstatement of its revenue, although it noted that the nature of the assessment in this instance was "tantamount to a punitive sanction." *Id.* at 12–13. The Commission thus reinstated the initial assessment.

Following its transfer of Mercury's appeal to its original jurisdiction, the Commonwealth Court acted on Mercury's claims as on a complaint at law for a refund, addressing this issue in two separate opinions. First, the Commonwealth

Court panel ruled on the Commission's preliminary objections, adopting Mercury's construction of Section 510. The panel held that Mercury was entitled to challenge the assessment on any of the statutory grounds listed in Section 510(d) (*i.e.,* prove assessment was excessive, erroneous, unlawful, or invalid) because it had complied with the statutory prerequisites for raising such challenges. Without explaining its conclusion in any detail, the court rejected the Commission's interpretation that the untimely filing of its actual revenue statement barred Mercury from offering its actual revenue as evidence that the assessment was excessive. *See Mercury Trucking II* at 5–6. Subsequently, the Commonwealth Court held a *de novo* hearing and issued a second opinion, in which it rejected the Commission's arguments again, quoting from the *Mercury Trucking II* decision. The court then concluded that the Commission had stipulated that Mercury overpaid its assessment and, accordingly, it ordered a refund. *See Mercury Trucking III* at 5–6.

## II.

Preliminarily, we must address our standard of review in light of the unusual procedural posture of this case. If the Commonwealth Court had properly sat in its appellate capacity, its review in the Commonwealth Court would have been limited to determining whether the Commission violated Mercury's constitutional rights, the law, or agency procedure; and whether the necessary findings of fact were supported by substantial evidence. 2 Pa.C.S. § 704; *see, e.g., Lloyd v. Pa. Pub. Util. Comm'n,* 17 A.3d 425, 429 (Pa.Cmwlth.2011). Here, disputes over findings of fact necessary to the adjudication were not a factor because the parties stipulated to the facts; moreover, Mercury had raised no claims regarding violations of constitutional rights or agency procedure.

With respect to issues of law, which were in dispute in this case, the Commonwealth Court was to apply a *de novo* standard of review and, to the extent necessary, a plenary scope of review. *Chester Water Auth. v. Pa. Pub. Util. Comm'n,* 581 Pa. 640, 868 A.2d 384, 389 n. 9 (2005). Here, the lower court

panel's review happened to be *de novo* and plenary because the court (erroneously) acted upon Mercury's petition for review as upon a complaint filed in its original jurisdiction. *See* 66 Pa.C.S. § 510(d). In short, given the precise nature of the dispute here, it happens that the Commonwealth Court applied the appropriate standard of review, albeit for the wrong reason.

On appeal to this Court, review is similarly limited, as provided by Section 704 of the AAL. *See AT & T v. Pa. Pub. Utility Comm'n*, 558 Pa. 290, 737 A.2d 201, 207 (1999). The only issue raised is the same as that decided below: whether Mercury is entitled to a refund under a proper construction of Section 510 of the Public Utility Code. As this is a question of law, our standard of review is also *de novo*, or non-deferential, and the scope of review is plenary as, to the extent necessary, this Court may review the entire record in making its decision. *Heath v. Workers' Comp. Appeal Bd. (Pa. Bd. of Prob. & Parole)*, 580 Pa. 174, 860 A.2d 25, 29 n. 2 (2004). Our review is unaffected, therefore, by the procedural history and posture of the case. Accordingly, we proceed to address the parties' substantive claims.

### III.

The dispositive merits question before the Court is whether Mercury may obtain a partial refund of its assessment based upon proof that the Commission's estimate of Mercury's revenue differed from Mercury's actual revenue. The parties agree that the answer to this question depends upon the interpretation of Section 510(b) of the Public Utility Code, and specifically of the term "binding," in relation to objections to an initial assessment.

We discussed the governing principles of statutory construction to some extent in part A.IV, *supra*. We reiterate that the plain language of a statute is, as a general rule, the best indicator of legislative intent. *Bd. of Revision of Taxes*, 4 A.3d at 622 (citing 1 Pa.C.S. § 1921(a)). Moreover, we remain mindful of the Commission's role in interpreting and applying

the Public Utility Code and note that, "[w]hile this Court ultimately maintains the final responsibility to interpret or construe statutes, this function is appropriately informed by the approach of the expert administrative agency." *Schneider*, 960 A.2d at 450 n. 8.

Section 510 states, in relevant part:

(b) Allocation of assessment.—On or before March 31 of each year, every public utility shall file with the [C]ommission a statement under oath showing its gross intrastate operating revenues for the preceding calendar year. If any public utility shall fail to file such statement on or before March 31, **the [C]ommission shall estimate such revenues, which estimate shall be binding upon the public utility for the purposes of this section.** For each fiscal year, the allocation shall be made as follows: [ (subsections (1) through (4) describe the statutory formula that the Commission is to use in calculating the assessment rates of all Commission-regulated utilities) ].

(c) Notice, hearing and payment.—The [C]ommission shall give notice ... to each public utility of the amount lawfully charged against it under the provisions of this section, which amount shall be paid by the public utility within 30 days of receipt of such notice.... Within 15 days after receipt of such notice, **the public utility ... may file with the [C]ommission objections setting out in detail the grounds upon which the objector regards such assessment to be excessive, erroneous, unlawful or invalid.** The [C]ommission, after notice to the objector, shall hold a hearing upon such objections....

(d) Suits by public utilities.—No suit or proceeding shall be maintained in any court for the purpose of restraining or in anywise delaying the collection or payment of any assessment made under subsections (a), (b) and (c), but every public utility against which an assessment is made shall pay the same as provided in subsection (c)....

66 Pa.C.S. § 510(b)-(d) (emphasis added).

We agree with the Commission that the language of the statute is clear and unambiguous. Section 510(b) employs

mandatory language requiring public utilities to file statements of revenue by March 31 each year. If a utility fails in that obligation, either by failing to file at all or failing to file in timely fashion, the provision requires that the Commission estimate its revenue. The Commission is then to use the estimated revenue to calculate the assessment of the utility. The calculation is a ministerial task which results in a set of individual assessment rates applied to Commission-regulated utilities. Any utility may file objections to the assessment on grounds that it is excessive, erroneous, unlawful or invalid.

The Commission argues that the revenue estimate it derives under the statute is "binding" upon Mercury throughout the assessment process and, therefore, the utility is barred from challenging its assessment rate upon proof that its actual revenue is different, or even significantly lower. Conversely, Mercury alleges that its challenge (citing statutory grounds that the rate applied is excessive, erroneous, unlawful or invalid) was to the "non-binding" assessment, and not to the "binding" estimate. Mercury's position rests on two assumptions regarding the statutory scheme: (1) that, as pled, its claim is not a challenge to the "binding" revenue estimate; and (2) that while an estimated revenue is binding for the purposes of calculating the initial assessment, the adjudication of objections raised on statutory grounds under Sections 510(c) or 510(d) is divorced from an inquiry into whether the initial assessment was valid under Section 510(b). For the following reasons, we hold that the Commission's construction adheres more closely to the plain language of the statute.

As a preliminary matter, we consider it irrelevant whether Mercury pled its claim as a challenge to the assessment rate or as a challenge to the revenue estimate. In theory, there are multiple types of challenges that could sound under the statutory terms "excessive, erroneous, unlawful or invalid"; for example, a party could challenge the simple mathematical computation of the operations fee, or the factors used to calculate the estimated revenue, such as the assignment of a twelve percent increase over the prior year's revenue made by the Commission here. Pleading

aside, Mercury's claim is predicated on offering Mercury's actual revenue data as evidence that the estimated revenue figure, which the Commission was required to employ once Mercury failed in its obligation to provide its actual revenue, was erroneous or excessive. Mercury's request for a refund is centered on the theory that the Commission should have recalculated Mercury's assessment rate upon objections, by using the actual revenue figure rather than the estimated revenue data authorized by the statute.

Section 510(b) forecloses relief on this type of claim. The plain intent of the General Assembly is "that each public utility subject to [the Public Utility Code] shall advance to the [C]ommission its reasonable share of the cost of administering [the Code]." 66 Pa.C.S. § 510(f). To implement this purpose, the General Assembly devised a scheme for calculating each utility's share of the cost, and created incentives and tools for utilities and the Commission, respectively, to ensure that payment would be made and that such payment would be made timely and efficiently.[10]

Notably, Section 510(b) provides a strict deadline for filing actual revenue figures, which allows the Commission to accomplish its ministerial task of calculating assessment rates in an efficient and predictable manner.[11] As the Commission ex-

10. The Commission's tools include, among other things, the ability to suspend or revoke certificates of public convenience and to institute an action at law to recover the assessment together with additional costs incurred, if payment is not made by the utility. *See* 66 Pa.C.S. § 510(c). Another example is the prohibition against any court proceeding initiated for the purpose of restraining or otherwise delaying the collection or payment of any assessment made under subsections (a), (b), and (c). *See* 66 Pa.C.S. § 510(d).

11. Section 510(b) provides for a four-step calculation in which the Commission: (1) determines and assigns expenditures dedicated to the group of utilities to which the specific public utility belongs; (2) determines the balance of total expenditures, after dedicated expenditures are assigned, and assigns portions of the balance among groups of utilities in accordance with the proportion of their revenue to the total revenue sum for all utilities; (3) allocates a share of the total assessment to each utility group, in proportion to the expenditures assigned to the group; and (4) allocates a share of the assessment of the group to each utility, in proportion to the revenue of the utility to the total revenue sum of the public utilities in its group. *See* 66 Pa.C.S.

plains, the rates calculated for the various utilities are co-dependent because they are in large part based on a ratio of each utility's revenue to the revenues of all other utilities. Even relatively minor changes in the revenue data used to calculate assessments throughout the Commonwealth affect the entire rate system, and create substantial uncertainty regarding rates for all other utilities and the Commission's ability to cover its costs.[12] To avoid this ripple effect, the General Assembly deliberately devised an incentive for utilities to file their actual revenue statements on time: a utility that does not report its actual revenue by March 31 of the assessment year assumes the risk that the Commission will derive an inaccurate over-estimate of its revenue. On the other hand, of course, a utility that ignores or misses the March 31 deadline may benefit from an underestimation of its revenue, with the result that the utility's assessment will be lower than if its actual revenue was used in the calculation. The estimate is deemed "binding" for the purposes of calculating the assessment rates as provided by Section 510(b)(1) through (4), so that the Commission may go about its task of fairly allocating its costs among all utilities. *See* 66 Pa.C.S. § 510(b).

The resulting assessment rate is, as noted, subject to objections on the grounds that it is "excessive, erroneous, unlawful, or invalid." 66 Pa.C.S. § 510(c). Mercury argues that evi-

§ 510(b)(1)-(4). The complexity of this calculation is only marginally relevant to the substantive issue before us, and it is not necessary to address it in detail for decisional purposes.

12. Mercury correctly points out that the effect of a fluctuating assessment rate system, by itself, does not entitle the Commission to relief. The General Assembly permits the filing of objections, which could have the same destabilizing result if sustained. Objections, and the opportunities to be heard and present evidence, are properly available and reflect the General Assembly's recognition that property rights are affected in deriving assessments. *Cf. Rogers,* 724 A.2d at 321–22; *accord Kowenhoven,* 901 A.2d at 1009–10 (agencies must comply with due process). But, the General Assembly retains the power to prescribe the grounds on which objections are (available, as a matter of policy). In this case, the legislative scheme reflects a trade-off between the ability of each public utility to challenge an individual binding estimate of its revenue at will and the finality and predictability of assessments gained by utilities as a group.

dence of actual revenue lower than the revenue the Commission is forced to estimate retroactively proves that the assessment is excessive and is a valid ground for objection. A plain reading of the statute, however, indicates otherwise. Section 510(b)'s provision that an estimated revenue is "binding" is made without any qualification that the binding effect dissipates upon a utility's objection. Essentially, Mercury would have us read Section 510(b) as stating that the estimate is meaninglessly binding, *i.e.,* binding to assist the Commission in determining the proper proportionate assessments for all utilities, but with that determination subject to disruption any time an individual utility objects to this binding effect with a belated accounting of its actual revenues. By the same token, since the statute authorizes the Commission to estimate the revenue of a non-compliant utility, the fact of that estimation simply cannot establish an assessment rate that is "excessive, erroneous, unlawful, or invalid." Rather, it is a rate premised upon an approved statutory formula. Mercury's interpretation is not supported by the plain language of the provision and would essentially read the term "binding" out of Section 510(b).

Moreover, Mercury's reading of the statute has unreasonable consequences that the General Assembly could not have intended. We cannot agree, for instance, that the General Assembly devised the statute as an exercise for the Commission in administrative paper-shuffling and futility: require the Commission to calculate initial proportionate assessments utility-wide based on required estimates using a mandatory formula, while *per se* invalidating any compliant initial assessment and automatically requiring the Commission to undertake calculations anew based on different data once a non-compliant utility objects. Indeed, we view this construction of Section 510(b) as contrary to that part of the provision which places the burden of proof in an assessment challenge on the public utility. *See* 66 Pa.C.S. § 510(f) ("Intent of section"). Mercury's construction, furthermore, removes any incentive for a utility to file a timely statement of its actual revenue. Under Mercury's interpretation, a public utility

may ignore the revenue filing deadline without consequence because the utility may wait upon its assessment, keep silent if the Commission underestimates its actual revenue, but object in instances of overestimation by offering a belated, actual revenue statement as unrebuttable proof that the estimated revenue was "excessive." Indeed, the public utility would have an incentive to "roll the dice" on the Commission's estimate because, under Mercury's interpretation, a non-compliant utility, unlike a compliant utility, would be able to invalidate an undesirable assessment. Mercury's view of the statutory scheme veers too far from the General Assembly's intent that each public utility should assume its reasonable share of the Commission's administrative costs in a timely manner, and is therefore unsustainable.

Mercury also posits that the right to object (and prove that an assessment is "excessive, erroneous, unlawful, or invalid") is illusory unless an objection to estimated revenue in instances of non-compliant utilities can dissipate the binding effect of the revenue estimate. Again, we respectfully disagree.

The right to object is not thwarted given the availability of review of an assessment on different grounds. For example, in any computational regime mathematical errors may exist. A utility may complain that the statutory formula was incorrectly employed to arrive at the assessment rate, that the Commission violated the utility's due process rights by, *e.g.*, using an arbitrary or capricious formula to estimate revenue; or assert other challenges of this nature. In this sense, although fixed by law, any initial assessment theoretically is subject to challenge. A challenge, however, has to be appropriate and timely. A claim that the Commission failed to use late-filed actual revenue figures is not an appropriate ground for objection, in the face of statutory language that commands the Commission to estimate revenue when a utility fails in its duty to provide a timely statement of its actual revenue, and states that the estimate is "binding."

The Commonwealth Court erred in concluding that Mercury was entitled to a refund. The parties stipulated that "[t]he assessment for the 2004[sic] operation period would be

$12,242.98 less than the amount Mercury paid had the assessment been calculated on the gross intrastate operating revenues reported by Mercury." Stipulation of Facts, 7/6/2009, at 2. In light of the proper construction of the statute, as explained above, this subjunctive stipulation concerning the consequence of a contrary construction of the statute cannot be viewed as an admission that Mercury was entitled to a refund.

### *Conclusion*

Accordingly, we reverse the decision of the Commonwealth Court, vacate the judgment in favor of Mercury, and reinstate the adjudication of the Pennsylvania Public Utility Commission.

Jurisdiction relinquished.

Justice ORIE MELVIN did not participate in the decision of this case.

Justices EAKIN, BAER, TODD, and McCAFFERY join the opinion.

Justice SAYLOR files a dissenting opinion.

Justice SAYLOR, dissenting.

I respectfully differ with the majority's portrayal of Section 510(d) as a "vestigial remnant" of repealed laws, as well as with its suggestion that the repeated reenactment of the statute has been a mere "drafting oversight." Majority Opinion, at 1075–76. In my view, the statute embodies what is, in effect, a qualified *de novo* appeal avenue before a statewide tribunal.[1]

As the majority relates, the assessment procedure to which Section 510(d) is attached is a unique one, by which the Commission arranges to capture revenues from the companies which it regulates to secure funding for its own expenditures.

---

1. The *de novo* aspect is qualified, since the procedure entails an evidentiary overlay affording an initial *prima facie* effect to certain Commission documents and findings. *See* 66 Pa.C.S. § 510(d).

*See* 66 Pa.C.S. § 510(a). The scheme also involves the allocation of the assessment among various categories of utilities according to Commission estimates of expenditures which are deemed attributable to each. *See id.* § 510(b). Furthermore, the process relies substantially on self-reporting of revenues by individual utilities. *See id.*

In such a regime, it seems apparent to me that individual utilities bearing the assessment burden could rationally be concerned with the potential that self-interest might come into play on the part of the Commission (in advancing its own expenditures) or other utilities or utility groups (competing to minimize the assessment burden falling to each). In my view, Section 510(d) serves a meaningful role in reducing the potential for appearances of impropriety through the maintenance of a unique process of judicial oversight triggered by a direct action at law, with an extended time period allowed for continuing investigation and scrutiny. The prescribed process contrasts substantially with the deferential review of general agency adjudications under the Administrative Agency Law and associated Rules of Appellate Procedure, which must be invoked within a more compressed timeframe. Section 510's self-contained refund process also is plainly structured as a quid pro quo for the requirement that utilities must pay contested assessments in the first instance without delay or restraint. *See* 66 Pa.C.S. § 510(d) ("Any public utility making any such payment may, at any time within two years from the date of payment, sue the Commonwealth in an action at law to recover the amount paid, or any part thereof, on the ground that the assessment was excessive, erroneous, unlawful, or invalid....").

For the above reasons, I am unable to support the majority's decision to treat 510(d)'s specialized procedure for judicial redress as an irrelevancy.