Pennsylvania Public Utility
Commission,
                Petitioner

        v.

Delaware Valley Regional Economic
Development Fund, John Coffman,
Lauri A. Kavulich, Thomas Jay Ellis,
Gaetano Piccirilli, Albert Mezzaroba,
Anthony DiSandro, Roseanne
Pauciello, Jonathan Ireland, William
Martin, Thomas Muldoon (in their
official capacity),
                Respondents

:
:
:
:
:   No. 491 M.D. 2018
:
:   Argued: March 15, 2021
:
:
:
:
:
:
:
:
:
:
:

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE ELLEN CEISLER, Judge
              HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION BY
JUDGE McCULLOUGH                       FILED: May 5, 2021

       This matter returns to us on the Application for Summary Relief (Application) of Respondent Delaware Valley Regional Economic Development Fund (Fund), which requests dismissal of an action filed in this Court's original jurisdiction by Petitioner Pennsylvania Public Utility Commission (PUC).

## Background

       We summarized the background of this litigation in our prior decision, *Pennsylvania Public Utility Commission v. Delaware Valley Regional Economic*

*Development Fund* (Pa. Cmwlth., No. 491 M.D. 2018, filed June 27, 2019) (unreported) (*DVREDF I*), in which we addressed Respondents'[1] preliminary objections to the PUC's Complaint.[2]

> The Fund is a nonprofit corporation that was incorporated on December 20, 1994, for the stated purpose of, *inter alia*, organizing a group of citizens to promote the betterment, economic development, and national and international tourism and relations of the City of Philadelphia, the region commonly referred to as the "Delaware Valley," the Commonwealth of Pennsylvania, and the State of New Jersey. (Compl. ¶18.) In 1998, the Fund received approximately $21 million in funding from PECO Energy Company (PECO) ratepayers pursuant to a settlement order (1998 PECO Restructuring Settlement Order) entered by the PUC in connection with the Electricity Generation Customer Choice and Competition Act[2] and PECO's associated comprehensive Restructuring Plan. (Compl. ¶¶19, 21, 23-24, 28.) The 1998 PECO Restructuring Settlement Order required the Fund to use the funding for the issuance of loans and grants for economic development projects that have a job impact in PECO's service territory. (Compl. ¶¶19, 29.) In connection with the Fund's receipt of the funding, the PUC directed the Fund to file semi-annual reports, which detailed the Fund's activities and provided applicable statements of account, with the PUC's Bureau of Audits, so that the PUC and the public could monitor the Fund's activities to ensure

---

[1] The PUC initially advanced two counts. Count I, asserting breach of fiduciary duty, named John Coffman, Lauri A. Kavulich, Thomas Jay Ellis, Gaetano Piccirilli, Albert Mezzaroba, Anthony DiSandro, Roseanne Pauciello, Jonathan Ireland, William Martin, and Thomas Muldoon (Fund's Officers/Directors) as Respondents. Count II, asserting breach of contract, named the Fund as Respondent. As discussed below, our decision in *DVREDF I* dismissed Count I. Accordingly, subsequent pleadings addressing Count II have been brought by the Fund, rather than the Fund's Officers/Directors.

[2] As we noted in *DVREDF I*, slip op. at 2 n.1, although the PUC styled its initiating document as a "Complaint," and we have referred to it as such, the filing should properly have been designated as a petition for review filed in this Court's original jurisdiction. As in our prior decision, however, we will continue to refer to the pleading as the "Complaint."

2

that the funds were being used prudently and for the purpose for which the funds were intended.[3]  (Compl. ¶¶30-32.)

[2] 66 Pa. C.S. §§2801-2815.

[3]  The PUC initially required the Fund to file semi-annual reports for two fiscal years, beginning July 1, 1999, but thereafter extended the Fund's semi-annual reporting requirements until such time that the PUC approved any new transmission and distribution rates for PECO. (Compl. ¶¶30, 33-35.)

On May 21, 2010, as a result of the PUC's concerns regarding the Fund's lack of activity in issuing loans and grants as required by the 1998 PECO Restructuring Settlement Order and in an attempt to refocus the Fund on its obligations under the 1998 PECO Restructuring Settlement Order, the PUC and the Fund entered into an Agreement (2010 Settlement Agreement), whereby the Fund agreed to, *inter alia*: (1) submit quarterly reports with statements of accounts to the PUC's Bureau of Audits; (2) adhere to the loan and grant guidelines adopted by the Fund; (3) maximize the use of the PECO ratepayers' funds for the purpose set forth in the 1998 PECO Restructuring Settlement Order; and (4) provide the PUC with quarterly documentation of the grants and loans that the Fund awarded.  (Compl. ¶¶36, 55, 59 and App. B.)  As consideration, the PUC agreed to not initiate an action against the Fund for a violation of the 1998 PECO Restructuring Settlement Order and to provide the Fund with reasonable notice and an opportunity to cure any breach of the 2010 Settlement Agreement.  (Compl. ¶58 and App. B.)  The PUC also acknowledged that, as of the date of the 2010 Settlement Agreement, the Fund had complied with the terms and conditions of the 1998 PECO Restructuring Settlement Order.  (Compl. ¶58 and App. B.)

Based on information provided to the PUC, however, it appears to the PUC that the Fund's "loan and grant activity has steadily diminished and is presently moribund, while its portfolio has grown to 92% of its net assets" and that the Fund's "loans to assets ratio has decreased dramatically and has remained at an unacceptable low level."  (Compl. ¶¶38-

3

39, 77-78.) In addition, the PUC believes that the Fund does not have an "outreach program to identify and select credible economic projects" or a "marketing program to advertise its economic development purpose," has failed to update its website, and is unknown in the Philadelphia community. (Compl. ¶¶40-42.) The Fund has also stopped providing the PUC with information regarding its operations, and, therefore, the PUC is unable to determine whether the Fund is in compliance with the 1998 PECO Restructuring Settlement Order. (Compl. ¶43.) In other words, the PUC believes that the Fund has failed to use the PECO ratepayers' funds prudently or for the purpose intended by the 1998 PECO Restructuring Settlement Order. (Compl. ¶45.)

On July 16, 2018, the PUC filed its Complaint, setting forth causes of action against Respondents for breach of fiduciary duty and breach of contract. In its breach of fiduciary duty claim (Count I), the PUC alleges that the Fund's Officers/Directors breached the duties of care and loyalty that they owed to the Fund because the Fund has failed to adhere to its legal obligations under the 1998 PECO Restructuring Settlement Order and the 2010 Settlement Agreement to maximize the use of the PECO ratepayers' funds for the issuance of loans and grants for economic development projects that have a job impact in PECO's service territory. In its breach of contract claim (Count II), the PUC alleges that the Fund breached the 1998 PECO Restructuring Settlement Order and the 2010 Settlement Agreement by: (1) altogether ceasing to provide grants for economic development projects that have a job impact in PECO's service territory; (2) providing very few, if any, loans for economic development projects that have a job impact in PECO's service territory; (3) failing to provide the PUC with the documentation necessary for the PUC to determine whether the Fund has been utilizing the PECO ratepayers' funds for economic development projects that have a job impact in PECO's service territory; and (4) focusing its loans and grants on projects that have questionable economic benefit.

*DVREDF I*, slip op. at 3-5.

4

In *DVREDF I*, this Court sustained Respondents' preliminary objection to Count I—breach of fiduciary duty—under the "gist of the action" doctrine.[3] We reasoned that "[t]he 'gist' of the PUC's action sounds in contract, not tort, as the PUC's breach of fiduciary duty claim is based on the same conduct that the PUC alleges is a breach of the 1998 PECO Restructuring Settlement Order and the 2010 Settlement Agreement . . . ." *Id.* at 9. We accordingly dismissed Count I of the PUC's Complaint. However, we overruled Respondents' preliminary objections to Count II—breach of contract. We opined that the PUC had set forth sufficient facts to support its claim, thus overcoming Respondents' demurrer. *Id.* at 10-12.

Relevant to the issue presently before us, we rejected Respondents' request to dismiss Count II on statute of limitations grounds, finding the matter unsuitable for resolution on preliminary objections. Under Pennsylvania Rule of Civil Procedure No. 1030(a), all affirmative defenses, including the statute of limitations, must be pleaded in a responsive pleading as "new matter," and should not be raised on preliminary objections. Pa.R.C.P. No. 1030(a). We found no applicable exception to that rule, and because the PUC had challenged the premature assertion of the statute of limitations by filing a preliminary objection of its own, we sustained the PUC's preliminary objection and struck Respondents' preliminary objection based upon the statute of limitations. *DVREDF I*, slip op. at 12-13.

The Fund filed an amended answer on September 13, 2019, and properly raised the statute of limitations defense in new matter, among other affirmative defenses. The PUC filed preliminary objections to the Fund's new matter, which this Court overruled in an order dated July 27, 2020. On August 22, 2020, the Fund filed

---

[3] The "gist of the action" doctrine "precludes a party from raising tort claims where the essence of the claim actually lies in a contract that governs the parties' relationship." *DVREDF I*, slip op. at 7-8 (quoting *Sullivan v. Chartwell Investment Partners*, 873 A.2d 710, 718 (Pa. Super. 2005)).

5

an application for summary relief under Pennsylvania Rule of Appellate Procedure 1532, seeking dismissal of Count II of the PUC's Complaint on the basis of the statute of limitations. The PUC filed an application to quash on August 24, 2020, contending that the Fund's application was premature because the PUC had not yet filed an answer to the Fund's new matter. The PUC filed its answer two days later, on August 26, 2020.

The Fund then filed an answer to the PUC's application to quash, as well as preliminary objections to the PUC's answer and new matter, contending that the PUC's answer should be stricken as untimely because it was not filed within 20 days after this Court's July 27, 2020 order overruling the PUC's preliminary objections. In the event that this Court accepted the PUC's pleading, however, the Fund requested the opportunity to refile its application for summary relief, to allow it to address the content of the PUC's new pleadings. On October 16, 2020, this Court overruled the Fund's preliminary objections and accepted the PUC's answer as timely under Pa.R.A.P. 1516(b), which allows responsive pleadings in original jurisdiction actions to be filed within 30 days after service of the preceding pleading, rather than the 20 days provided under the Pennsylvania Rules of Civil Procedure. *Compare* Pa.R.A.P. 1516(b), *with* Pa.R.C.P. No. 1026(a). We thus overruled the Fund's preliminary objection, granted the Fund's request for leave to file an amended application for summary relief, and dismissed the PUC's application to quash as moot. (Order, 10/16/2020.)

The Fund filed the instant Application on November 5, 2020. The Application revisits the Fund's assertion of the statute of limitations, which we found premature in the context of preliminary objections in *DVREDF I*. The PUC answered the Application on November 20, 2020. Both parties have filed briefs in support of

6

their positions, and this Court heard oral argument on March 15, 2021. The matters raised in the Fund's Application are now ripe for disposition.[4]

## Arguments

### I. The Fund's Argument

The Fund asserts that the PUC commenced this action after the expiration of the four-year statute of limitations for claims of breach of contract under section 5525 of the Judicial Code, 42 Pa.C.S. §5525. The Fund contends that the PUC's action is premised upon asserted acts and omissions that it knew of for years before it decided to file suit. Specifically, the latest act that could give rise to the PUC's claim, the Fund contends, occurred in July 2013, when the Fund ceased providing quarterly reports to the PUC concerning its provision of grants and loans—an obligation imposed by the 2010 Settlement Agreement, but one from which the Fund believes it was relieved after

---

[4] Our standard of review over an application for summary relief under Pa.R.A.P. 1532(b) is similar to review of a motion for judgment on the pleadings or a motion for summary judgment:

> Summary relief is proper where the moving party establishes the case is clear and free from doubt, there are no genuine issues of material fact to be tried, and the movant is entitled to judgment as a matter of law. *Detar v. Beard*, 898 A.2d 26 (Pa. Cmwlth. 2006). When ruling on a motion for judgment on the pleadings in our original jurisdiction, we must view all of the opposing party's allegations as true, and only those facts that the opposing party has specifically admitted may be considered against the opposing party. We may only consider the pleadings themselves and any documents properly attached thereto. *Tulio v. Beard*, 858 A.2d 156 (Pa. Cmwlth. 2004). A party's motion for judgment on the pleadings will only be granted when there is no issue of material fact and the moving party is entitled to judgment as a matter of law. *Montgomery County v. Department of Corrections*, 879 A.2d 843 (Pa. Cmwlth. 2005); *Milton S. Hershey Medical Center of Pennsylvania State University v. Commonwealth*, 788 A.2d 1071 (Pa. Cmwlth. 2001).

*Fisher v. Department of Corrections*, 926 A.2d 992, 994 n.6 (Pa. Cmwlth. 2007).

delivering its final report on March 5, 2013 for the quarter ending December 31, 2012. (Application ¶¶8-9, 14-15.) To the extent that the PUC additionally alleges that the Fund breached the 2010 Settlement Agreement by failing to issue grants and failing to maintain a sufficiently high loan-to-assets ratio, the Fund highlights that the PUC was aware of the suspension of grants as early as 2013, and that the Fund's loan activity has remained at approximately the same level since 2010. *Id.* ¶16. The Fund thus contends that the PUC's cause of action for breach of contract accrued in 2013 at the latest, but the PUC waited over five years, until July 16, 2018, to commence its lawsuit. *Id.* ¶17. According to the Fund, the PUC's action is thus barred by the four-year statute of limitations.

Anticipating the PUC's rebuttal, the Fund contends that the PUC is not an entity entitled to invoke the doctrine of *nullum tempus occurrit regi* ("time does not run against the king"), the principle that the Commonwealth is not bound by, *inter alia*, statutes of limitations. *See Department of Transportation v. J.W. Bishop & Co.*, 439 A.2d 101, 102 (Pa. 1981) ("This Court has always adhered to the old and well known rule that statutes which in general terms divest pre[]existing rights or privileges do not bind the sovereign without express words to that effect.") (internal quotation marks omitted). Moreover, absent application of *nullum tempus*, the Fund argues that the PUC is unable to invoke the discovery rule[5] to toll the statute of limitations.

With regard to *nullum tempus*, the Fund's argument is twofold: it argues that the PUC is not a Commonwealth party for purposes of the doctrine, and that the

_____

[5] The discovery rule "arises from the inability of the injured, despite the exercise of due diligence, to know of the injury or its cause." *Pocono International Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983) (emphasis omitted). When applicable, the rule provides that the statute of limitations does not run against the plaintiff until the discovery of the injury, or the date upon which the injury reasonably should have been discovered. *Id.* ("[U]ntil such time as the plaintiff discovers, or reasonably should have discovered, the trespass, the running of the statute is tolled.").

8

dispute here concerns private rather than public funds, and thus does not fall within the scope of *nullum tempus*, which applies when the Commonwealth seeks to "vindicate public rights and protect public property." (Fund's Br. at 21 (quoting *J.W. Bishop*, 439 A.2d at 104).) The Fund argues that, for purposes of *nullum tempus*, we must look to three statutory provisions in order to determine whether a given entity can be deemed to be the "Commonwealth": sections 8501 and 102 of the Judicial Code,[6] 42 Pa.C.S. §§8501, 102, and section 102 of the Commonwealth Attorneys Act (CAA),[7] 71 P.S. §732-102.

Section 8501 of the Judicial Code defines a "Commonwealth party," for purposes of sovereign immunity, as a "Commonwealth agency and any employee thereof, but only with respect to an act within the scope of his office or employment." 42 Pa.C.S. §8501. Section 102 defines a "Commonwealth agency" as "[a]ny executive agency or independent agency." *Id.* §102. Although the Fund acknowledges that section 102 of the Judicial Code provides a definition of "independent agency,"[8] it does not rely upon it, and instead points to section 102 of the CAA, which, it argues, provides a "complete list" of independent agencies. (Fund's Br. at 22 (quoting *Bradley v. Pennsylvania Turnpike Commission*, 550 A.2d 261, 262 (Pa. Cmwlth. 1988).) The CAA's enumerated list of independent agencies does not include the PUC; indeed, it specifies that, for purposes of the CAA, the PUC is neither an executive agency nor an

---

[6] 42 Pa.C.S. §§101-9913.

[7] Act of October 15, 1980, P.L. 950, *as amended*, 71 P.S. §§732-101—732-506.

[8] Section 102 of the Judicial Code defines "independent agency," in relevant part, as "[b]oards, commissions, authorities and other agencies and officers of the Commonwealth government which are not subject to the policy supervision and control of the Governor, but the term does not include any court or other officer or agency of the unified judicial system or the General Assembly and its officers and agencies." 42 Pa.C.S. §102.

9

independent agency.[9]  In the Fund's view, then, the PUC cannot be regarded as a Commonwealth party for purposes of the *nullum tempus* doctrine.  (Fund's Br. at 23.) In asserting the relevance of section 102 of the CAA, the Fund notes that both this Court and our Supreme Court have cited the provision to demonstrate the Pennsylvania Turnpike Commission's (Turnpike Commission) status as an independent agency.  *Id.* at 23-24 (citing *Zauflik v. Pennsbury School District*, 104 A.3d 1096, 1128 n.17 (Pa. 2014); *Smith v. Mognet*, 618 A.2d 1215, 1217 (Pa. Cmwlth. 1992)).

Even if the PUC may be deemed to be the Commonwealth for purposes of *nullum tempus*, the Fund contends that the PUC nonetheless cannot receive the benefit of the doctrine in this case because the parties' dispute concerns privately sourced funds, *i.e.*, money paid to PECO by its ratepayers, and then transferred to the Fund under the 1998 PECO Restructuring Settlement Order.  The Fund stresses our Supreme Court's statement in *J.W. Bishop* that, "[w]henever the Commonwealth

---

[9] The list of independent agencies provided in the CAA is as follows:

> The Department of the Attorney General, the Pennsylvania Fish Commission, the Pennsylvania Game Commission, the Historical and Museum Commission, the State Civil Service Commission, the Pennsylvania Turnpike Commission, the Milk Marketing Board, the Pennsylvania Liquor Control Board, the Pennsylvania Human Relations Commission, the Pennsylvania Labor Relations Board, the State Tax Equalization Board, Pennsylvania Higher Education Assistance Agency, the Pennsylvania Crime Commission, and the State Ethics Commission. Except for the provisions of section 204(b) and (f) [of the CAA, 71 P.S. §732-204(b), (f)], and for actions pursuant to [42 Pa.C.S. §§8521-27] (relating to limited waiver of sovereign immunity), *for the purposes of this act the department of the Auditor General, including the Board of Claims, State Treasury and the Public Utility Commission shall not be considered either executive agencies or independent agencies.*

Section 102 of the CAA, 71 P.S. §732-102 (emphasis added).

10

invokes the doctrine of *nullum tempus*, it is seeking as a plaintiff to vindicate public rights and protect public property." (Fund's Br. at 27 (quoting *J.W. Bishop*, 439 A.2d at 104).) In order to establish the putatively private character of the disputed funds, the Fund traces the "chain of custody" of the money. *Id.* at 28. The money "started in the pockets of PECO customers," who then "transferred that money to PECO as payment for their electric bills," which then transferred a portion of the revenue to the Fund. *Id.* Because none of the money was paid to the PUC, and because it was not derived from tax payments, the Fund contends that the money at issue "is not public money in any plausible sense of the term." *Id.* at 29. In the Fund's view, the private character of the disputed funds further renders the *nullum tempus* doctrine inapplicable.

Finally, assuming that *nullum tempus* does not apply, the Fund further argues that the PUC is unable to resort to the discovery rule. The Fund refers to the PUC's assertion that it was unaware whether the Fund was in compliance with the 2010 Settlement Agreement until PUC personnel read an article about the Fund's management in 2017. (Fund's Br. at 34 (citing Compl. ¶¶73-74) (noting that the PUC "became concerned" about the Fund after reading the article).) The Fund suggests that this is an invocation of the discovery rule. However, the Fund stresses, an *en banc* panel of this Court recently held that the discovery rule does not apply to a claim for breach of a written contract. *Id.* at 35 (discussing *Carulli v. North Versailles Township Sanitary Authority*, 216 A.3d 564 (Pa. Cmwlth. 2019) (*en banc*)).[10] Even absent the holding of *Carulli*, however, the Fund emphasizes that the discovery rule requires the exercise of reasonable diligence. In the Fund's view, the PUC failed to exercise such

---

[10] The present author dissented in *Carulli*, concluding that persuasive authority weighed in favor of maintaining the discovery rule in breach of contract cases. *Carulli*, 216 A.3d at 586-89 (McCullough, J., dissenting).

11

diligence, inasmuch as it failed to conduct any inquiry into the Fund for several years after the asserted breach, and deliberately declined to litigate the Fund's cessation of quarterly reports in 2013. *Id.* at 36-38. Thus, even if the discovery rule is available to the PUC in this case, the Fund contends that the PUC failed to establish its requisites. As such, the Fund asks us to find that the PUC's action is barred by the statute of limitations, and to dismiss the remaining count of its Complaint.

## II. PUC's Argument

The PUC, by contrast, contends that it is a Commonwealth agency entitled to invoke the *nullum tempus* doctrine. The PUC argues that the Fund places undue focus upon the CAA, to the exclusion of the Judicial Code and the PUC's enabling statute, the Public Utility Code.[11] As a threshold inquiry, the PUC notes that, under the *nullum tempus* doctrine, statutes of limitations do not apply to the Commonwealth and its agencies, "unless the statute of limitations expressly provides that it limits the government's right to sue." (PUC's Br. at 15 (quoting *Township of Salem v. Miller Penn Development, LLC*, 142 A.3d 912, 918 (Pa. Cmwlth. 2016)).) The statute providing for a four-year limitations period for contract actions, 42 Pa.C.S. §5525, does not state that the Commonwealth or any Commonwealth agencies are bound thereby. Thus, the PUC notes, the Fund's position on the *nullum tempus* doctrine can prevail only if the PUC is removed from the definition of a Commonwealth party. (PUC's Br. at 15-16.)

The PUC notes that the Public Utility Code expressly defines the PUC as an "independent administrative commission." 66 Pa.C.S. §301(a). The PUC further highlights that our Supreme Court has explained that "[a]n independent administrative commission is a *Commonwealth agency* for purposes of the Judicial Code" and for

---

[11] 66 Pa.C.S. §§101-3316.

12

purposes of this Court's jurisdiction. *Mercury Trucking, Inc. v. Pennsylvania Public Utility Commission*, 55 A.3d 1056, 1058 n.4 (Pa. 2012) (emphasis added). Therefore, the PUC contends that it is a "Commonwealth party" for purposes of sovereign immunity, which the Judicial Code defines as a "Commonwealth agency and any employee thereof . . . ." 42 Pa.C.S. §8501. A "Commonwealth agency" under the Judicial Code is any "executive agency or independent agency." 42 Pa.C.S. §102. An "independent agency," in turn, is defined, in relevant part, as "[b]oards, *commissions*, authorities and other agencies and officers of the Commonwealth government which are not subject to the policy supervision and control of the Governor . . . ." *Id.* (emphasis added). The PUC contends that it plainly falls within the definition of an "independent agency," and, thus, it is a "Commonwealth party" for purposes of both sovereign immunity and *nullum tempus*. (PUC's Br. at 16-18.)

The PUC acknowledges that section 102 of the CAA excludes it from the definition of "independent agency" for purposes of that Act. 71 P.S. §732-102. However, the PUC contends that this was a necessary feature of the statutory scheme because the Public Utility Code contains separate provisions governing the powers of the PUC's Chief Counsel. Had the General Assembly not carved out the PUC in the CAA, then a conflict would have arisen between the authority of the PUC's Chief Counsel and that of the Attorney General. (PUC's Br. at 19-20.) Specifically, section 403 of the CAA states that, "[w]henever any action is brought by or against any independent agency or independent agency official, the agency head may request . . . the Attorney General to authorize the agency counsel to supersede the Attorney General and represent the agency or its official," and if the Attorney General declines such request, "the agency head may authorize the agency counsel to intervene in the litigation." Section 403(a)-(b) of the CAA, 71 P.S. §732-403(a)-(b). By contrast,

13

under the Public Utility Code, the PUC's Chief Counsel is expressly authorized, without permission of the Attorney General, to "proceed in the name of the Commonwealth, by mandamus, injunction, or quo warranto, or other appropriate remedy at law or, in equity, to restrain violations of the provisions of [the Public Utility Code], or the regulations or orders of the [PUC], or the judgments, orders, or decrees of any court, or to enforce obedience thereto." 66 Pa.C.S. §503. Thus, the PUC argues, it was necessary for the General Assembly to exclude the PUC from the definition of "independent agency" for purposes of the CAA, because subjecting the PUC to the CAA's provisions regarding representation by Commonwealth attorneys would pose a conflict with the Public Utility Code. In the PUC's view, the CAA's accommodation of the Public Utility Code for purposes of legal representation also demonstrates the inapplicability of the case law cited by the Fund—*Smith* and *Bradley*—which both concerned the Turnpike Commission. The PUC argues that there is no provision in the Turnpike Commission's enabling statute that would conflict with the CAA, and thus, there was no reason to exclude that entity from the definition of "independent agency" in the CAA.

The PUC argues that the CAA does not provide the exclusive definition of an "independent agency" for all purposes. Importantly, the PUC notes that the definitions provided in the CAA expressly apply "when used in this act," *i.e.*, the CAA. (PUC's Br. at 26 (quoting 71 P.S. §732-102).) The PUC observes that the term "independent agency" is defined in numerous statutes, most of which closely track the definition provided in the Judicial Code, and generally classify independent agencies as "[b]oards, commissions, authorities and other agencies and officers of the Commonwealth government which are not subject to the policy supervision and control of the Governor . . . ." *Id.* at 24 (quoting, *inter alia*, 2 Pa.C.S. §101). The PUC thus

14

suggests that the Fund unduly narrows the focus of the inquiry upon the CAA, rather than the numerous other statutory provisions that demonstrate the PUC's status as an independent agency.

As it concerns the Fund's contention that the PUC's action is not directed toward public rights, the PUC asserts that the Fund mischaracterizes the funds at issue as merely a portion of PECO's revenues. The PUC emphasizes it exercised its rate-approval authority in directing PECO to collect 1.495 cents per kilowatt-hour from its customers and to transfer the money to the Fund, so that the Fund could use it for economic development projects that have a job impact in the area. (PUC's Br. at 26-27.) To the extent that the Fund asserts that the PUC has no authority over the disputed funds, the PUC argues that the Fund is equitably estopped[12] from advancing this position, because the Fund agreed to the 2010 Settlement Agreement, which recognized the PUC's authority to enforce compliance with the 1998 PECO Restructuring Settlement Order—the source of the funds at issue. *Id.* at 27-30. If the Fund believed that the PUC is not seeking to enforce a public right, the PUC argues, then it would have contested the PUC's authority over the funds in 2010, but it instead assented to the PUC's oversight authority and agreed to the 2010 Settlement Agreement. *Id.* at 31.

If we decline to find the Fund's position barred by equitable estoppel, the PUC contends that its oversight of the funds is authorized by the Public Utility Code. Section 1301 provides that "[e]very rate made, demanded, or received by any public utility . . . shall be just and reasonable, and in conformity with regulations or orders of the [PUC]." 66 Pa.C.S. §1301. The PUC argues that the funds transferred to the Fund

---

[12] The doctrine of equitable estoppel "recognizes that an informal promise implied by one's words, deeds or representations which leads another to rely justifiably thereon to his own injury or detriment, may be enforced in equity." *Novelty Knitting Mills, Inc. v. Siskind*, 457 A.2d 502, 503 (Pa. 1983). "The two essential elements of equitable estoppel are inducement and justifiable reliance on that inducement." *Id.*

15

were collected pursuant to the PUC's public function of overseeing PECO's rates and approving its activities under the 1998 PECO Restructuring Settlement Order. (PUC's Br. at 32.) The PUC additionally cites the enforcement authority provided to it under the Public Utility Code, which grants it "full power and authority" to "enforce, execute and carry out" the provisions of the Code. *Id.* at 33 (quoting 66 Pa.C.S. §501(a)-(b)). The PUC acknowledges that the Fund "is not a public utility"; however, it argues that this does not exempt the Fund from the PUC's authority, "since the PECO ratepayer funds it received from PECO were a direct result of the [PUC's] exercise of its public function of approving public utility rates for an express purpose." *Id.*

More generally, the PUC suggests that we reject the Fund's argument that it is not seeking to enforce public rights because the funds at issue were not derived from tax revenue. This argument, the PUC contends, "wholly ignores that PECO customers had no choice but to pay 1.495 cents per kilowatt[-hour] earmarked for [the Fund] from 1998 to 2012." *Id.* at 34. According to the PUC, the funds were derived from its function of ensuring that rates charged by public utilities are in conformity with the PUC's regulations and orders—a matter of oversight over public property. *Id.* at 34-35. The PUC emphasizes that PECO did not transfer money to the Fund as a mere gratuity; rather, the PUC expressly directed PECO to distribute the funds via the 1998 PECO Restructuring Settlement Order. Moreover, as further evidence that the PUC's action is directed toward the benefit of the public, the PUC highlights that its requested remedy is to redistribute the funds to PECO ratepayers, not to expand the PUC's coffers. *Id.* at 36 & n.8 (citing Compl. ¶99).

For all of these reasons, the PUC asserts that it is entitled to invoke the *nullum tempus* doctrine, excusing it from the statute of limitations. In the alternative, however, the PUC argues that it commenced its action within the statute of limitations

16

because its cause of action did not accrue until 2018. The linchpin of this argument is the PUC's assertion that the 2010 Settlement Agreement was a continuous contract, inasmuch as it had no defined termination date. Although the statute of limitations for a contract claim generally begins to run on the date of the breach, if the agreement "does not fix any certain time for payment or for the termination of the services, the contract will be treated as continuous, and the statute of limitations does not begin to run until the termination of the contractual relationship between the parties." *Id.* at 38 (quoting *GAI Consultants, Inc. v. Homestead Borough*, 120 A.3d 417, 424 (Pa. Cmwlth. 2015)). Where the Fund asserts that the purported breach of the 2010 Settlement Agreement occurred in 2013 when the Fund ceased providing quarterly documentation of its loan and grant activity to the PUC, the PUC argues that this was an "immaterial breach" that did not necessitate action at the time. *Id.* at 39-40. Seeking to terminate the entire Agreement over this failure, the PUC opines, "would have been an unquestionably disproportionate remedy" given that the PUC reasonably believed that the Fund otherwise was in compliance with its obligations. *Id.* at 41. The breach giving rise to this litigation, the PUC argues, occurred on March 28, 2018, when the Fund refused to comply with the PUC's requests for information about its operations, and took the position that the PUC no longer had any oversight authority over its loan and grant activities. *Id.* at 47. The PUC argues that this was when the parties' continuous contractual relationship was terminated, and thus the date upon which the statute of limitations began to run. As such, whether by *nullum tempus* or the jurisprudence surrounding continuous contracts, the PUC argues that its action is not barred by the statute of limitations.

17

## Discussion

Upon review of the applicable statutory framework and the relevant case law, we conclude that the PUC is a Commonwealth party that may assert the doctrine of *nullum tempus* in this litigation. At the outset, we discern no indication of legislative intent to bind the Commonwealth or its agencies to the statute of limitations at issue. "Under the doctrine of *nullum tempus*, statutes of limitations are not applicable to actions brought by the Commonwealth or its agencies unless a statute expressly so provides." *Selinsgrove Area School District v. Lobar, Inc.*, 29 A.3d 137, 139 (Pa. Cmwlth. 2011) (quoting *Delaware County v. First Union Corporation*, 929 A.2d 1258, 1261 (Pa. Cmwlth. 2007)). The parties are in agreement that section 5525 of the Judicial Code, 42 Pa.C.S. §5525, sets forth the four-year statute of limitations that would apply to the PUC's claim for breach of contract, should *nullum tempus* not apply. It is both plain and undisputed that this statute contains no provision expressly rendering it applicable to the Commonwealth or its agencies.

The Fund, thus, must establish either that the PUC is not a Commonwealth party, or that its action does not serve to advance the rights of the public. *See J.W. Bishop*, 439 A.2d at 104 ("Whenever the Commonwealth invokes the doctrine of *nullum tempus*, it is seeking as a plaintiff to vindicate public rights and protect public property."). We find the Fund's argument lacking on both points.

### I. Commonwealth Party

Although sovereign immunity and *nullum tempus* are distinct doctrines, we have explained that they arise from similar prerogatives of the sovereign. "Sovereign immunity is invoked as a shield by the sovereign defendant against suits from parties allegedly injured by its wrongful conduct or that of its agents." *Township of Indiana v. Acquisitions & Mergers, Inc.*, 770 A.2d 364, 372 (Pa. Cmwlth. 2001)

18

(citing *Northampton County Area Community College v. Dow Chemical, U.S.A.*, 566 A.2d 591, 594 (Pa. Super. 1989)). "Conversely, *nullum tempus* is invoked by the sovereign plaintiff and is employed as a sword to strike down the statute of limitation[s] defense raised by the defendant whose conduct is alleged to have injured the sovereign in some manner." *Id.* (citing *Mt. Lebanon School District v. W.R. Grace & Company*, 607 A.2d 756, 760 (Pa. Super. 1992)). Pennsylvania courts have concluded, therefore, that Commonwealth parties which are entitled to sovereign immunity are also entitled to invoke the *nullum tempus* doctrine.

In *Smith v. Mognet*, for instance, we considered whether the Turnpike Commission is a Commonwealth party entitled to assert *nullum tempus*. There, relying upon the Superior Court's reasoning in *Northampton County*, 566 A.2d at 598, we concluded that "an entity which is classified by the legislature as a Commonwealth party for purposes of sovereign immunity is also a Commonwealth party for purposes of *nullum tempus*." *Smith*, 618 A.2d at 1217. We already had held, in *Bradley*, that the Turnpike Commission is entitled to assert sovereign immunity. *Bradley*, 550 A.2d at 262-63. Accordingly, "because the [Turnpike] Commission is a Commonwealth party for purposes of sovereign immunity, it may assert the doctrine of *nullum tempus*." *Smith*, 618 A.2d at 1217.

The Fund's argument is premised upon *Bradley*. According to the Fund, we determined that the Turnpike Commission is a Commonwealth party because it is listed within the CAA's definition of an "independent agency." Section 102 of the CAA, 71 P.S. §732-102. This is partly true. *Bradley* explained:

> "Commonwealth parties" is defined to include "Commonwealth agencies" under 42 Pa.C.S. §8501. Under 42 Pa.C.S. §102, "Commonwealth agency" is defined as an executive or independent agency. Independent agency is defined, in part, under the same section as: "Boards,

19

> Commissions, authorities, and other agencies and officers of the Commonwealth government which are not subject to the policy, supervision and control of the [Governor] . . . ." Under [s]ection 102 of Commonwealth Attorneys Act, 71 P.S. §732–102, *a complete list of independent agencies is listed and the Turnpike Commission is one of the independent agencies enumerated*. Finally, in *Philips Brothers Electrical Contractors, Inc. v. Commonwealth of Pennsylvania, Pennsylvania Turnpike Commission*, [465 A.2d 60 (Pa. Cmwlth. 1983)], we held that the Turnpike Commission was an independent agency and therefore a Commonwealth agency.   Accordingly, we conclude that the [Turnpike] Commission is a Commonwealth agency entitled to sovereign immunity.

*Bradley*, 550 A.2d at 262-63 (emphasis added; footnotes omitted).  The Fund seizes upon *Bradley*'s description of the CAA as providing a "complete list" of independent agencies.  If the PUC is not included in that list, the argument goes, then it is not an "independent agency" and thus, presumably, not a "Commonwealth party" entitled to assert *nullum tempus*.  However, *Bradley* not only referenced the CAA, but also relied upon the definitions of "Commonwealth agency" and "independent agency" under the Judicial Code, 42 Pa.C.S. §102, as well as prior case law characterizing the Turnpike Commission as a Commonwealth agency.

The Public Utility Code clearly classifies the PUC as an "independent administrative commission."   66 Pa.C.S. §301(a).   The PUC thus fits rather comfortably into the description of an "independent agency" under the Judicial Code, defined in relevant part as:  "[b]oards, *commissions*, authorities and other agencies and officers of the Commonwealth government which are not subject to the policy supervision and control of the Governor . . . ." 42 Pa.C.S. §102 (emphasis added).  As in *Bradley*, moreover, there is existing case law that recognizes the PUC's status as a Commonwealth agency.  Our Supreme Court in *Mercury Trucking* stated that, as an

20

"independent administrative commission," the PUC "is a Commonwealth agency for the purposes of the Judicial Code . . . ." *Mercury Trucking*, 55 A.3d at 1068 n.4.

This passage in *Mercury Trucking* effectively concludes this portion of our analysis, as a "Commonwealth agency" is, by definition, a "Commonwealth party" for purposes of sovereign immunity, 42 Pa.C.S. §8501, and thus an entity entitled to invoke the *nullum tempus* doctrine. *Smith*, 618 A.2d at 1217. But even absent *Mercury Trucking* and the clear statutory language quoted above, we would nonetheless reject the constricted understanding of an independent agency that the Fund derives from the CAA. *See supra* note 8 (CAA definition of "independent agency").

## II. Commonwealth Attorneys Act

First, the definitions provided in section 102 of the CAA, including that of an "independent agency," expressly apply "when used in this act," *i.e.*, the CAA. 71 P.S. §732-102. Although the definition set forth there can prove to be a useful shortcut for identifying specific independent agencies—such as how we used the definition in *Bradley* to confirm the Turnpike Commission's status as an independent agency—the CAA was not intended to delineate an exclusive list of the specific entities that are entitled to assert sovereign immunity or that receive the benefit of the *nullum tempus* doctrine. Rather, the CAA concerns legal representation of Commonwealth parties. Moreover, we agree with the PUC that the General Assembly had a good reason to exempt the PUC from the definition of an independent agency *for the purposes of the CAA*. To reiterate, the CAA's definition of "independent agency" lists numerous specific agencies by name, and then states:

> Except for the provisions of section 204(b) and (f),[1] and for actions pursuant to 42 Pa.C.S. §5110 (relating to limited waiver of sovereign immunity),[2] for the purposes of this act the department of the Auditor General, including the Board of Claims, State Treasury and the Public Utility Commission

21

shall not be considered either executive agencies or independent agencies.

[1] 71 P.S. §732-204.

[2] 42 Pa.C.S. §5110 (repealed); *see now*, 42 [Pa.C.S. §§]8521[-27].

Section 102 of the CAA, 71 P.S. §732-102.

Section 204(b) and (f) of the CAA, to which the PUC is subject under the definition, provides that the Attorney General shall review, "for form and legality," all "proposed rules and regulations of Commonwealth agencies," all "Commonwealth deeds, leases and contracts to be executed by Commonwealth agencies," and all "fidelity, surety, performance and similar bonds." 71 P.S. §732-204(b), (f). Notably, the definition of "independent agency" does not subject the PUC to section 204(c), which provides that, in civil litigation, the Attorney General "shall represent the Commonwealth and all Commonwealth agencies and upon request, the Departments of Auditor General and State Treasury and the Public Utility Commission in any action brought by or against the Commonwealth or its agencies . . . ." *Id.* §732-204(c). Section 308 of the Public Utility Code, in turn, provides that the PUC's Law Bureau, whose director shall be the PUC's Chief Counsel, is responsible for representing the PUC in litigation, except where that litigation is referred to the Attorney General. 66 Pa.C.S. §308(b) ("The Director of the Law Bureau shall be the [C]hief [C]ounsel of the [PUC] . . . . Except for litigation referred to the Attorney General or other appropriate outside counsel, the Law Bureau solely shall be responsible to represent the [PUC] upon appeals and other hearings in the . . . courts of this Commonwealth or in any Federal court or agency and in actions instituted to recover penalties and to enforce regulations and orders of the [PUC].").

22

Further, as the PUC highlights, Chapter 4 of the CAA, 71 P.S. §§732-401 to 732-403, provides for the legal representation of the independent agencies identified in section 102 of the CAA, and outlines the powers and duties of the agencies' Chief Counsels, which are distinct from those of the Attorney General. For instance, in order to represent the independent agency in an action brought by or against the agency or an agency official, the agency's Chief Counsel must "request in writing, setting forth his reasons, the Attorney General to authorize the agency counsel to supersede the Attorney General and represent the agency or its official." Section 403(a) of the CAA, 71 P.S. §732-403(a). The Chief Counsel of the PUC, by contrast, does not require the permission of the Attorney General in order to "proceed in the name of the Commonwealth . . . to restrain violations of the provisions of [the Public Utility Code], or of the regulations or orders of the [PUC], or the judgments, orders, or decrees of any court, or to enforce obedience thereto." 66 Pa.C.S. §503.

These contrasting statutory provisions demonstrate that, *for purposes of the CAA*, the PUC could not simply be labeled an "independent agency" like the others listed in section 102 of the CAA. Had the General Assembly done so, then the provisions of the CAA that govern the representation of independent agencies would conflict with the provisions of the Public Utility Code that specify the powers of the PUC's Law Bureau and Chief Counsel. Stated simply, under the Public Utility Code, legal representation of the PUC follows a different "default" procedure than other independent agencies listed in section 102 of the CAA. For the former, the PUC's Chief Counsel represents the PUC in litigation unless the matter is referred to the Attorney General; for the latter, the Attorney General represents the agency absent the Chief Counsel's request to represent the agency in the Attorney General's stead. It is sensible, then, that the General Assembly would avoid such conflict by specifying that,

23

"for the purposes of this act," the CAA would not classify the PUC as an independent agency. 71 P.S. §732-102. This does not mean, as the Fund suggests, that the PUC is therefore excised categorically from the definitions of an "independent agency," a "Commonwealth agency," or a "Commonwealth party" under the Judicial Code. 42 Pa.C.S. §§102, 8501.

Moreover, setting aside its incorporation of the nuanced relationship between the CAA and the Public Utility Code, the definition of "independent agency" under the CAA contains language that poses another significant challenge to the Fund's position. The CAA's exemption of the PUC from the definition of "independent agency" contains a caveat: "Except . . . for actions pursuant to 42 Pa.C.S. §[8521] (*relating to limited waiver of sovereign immunity*) . . . ." 71 P.S. §732-102 (emphasis added). On its face, this language appears to suggest that the PUC is indeed considered to be an independent agency for purposes of sovereign immunity. This, in turn, renders the PUC a Commonwealth party entitled to invoke the doctrine of *nullum tempus*. *Smith*, 618 A.2d at 1217.

The Fund's reliance upon the CAA's enumeration of independent agencies does not withstand scrutiny. Indeed, if we were to adopt the Fund's position, an obvious question would arise: if not a Commonwealth agency, then what is the PUC? The Fund provides no answer. We conclude that the CAA does not alter the PUC's clear status as an "independent administrative commission," 66 Pa.C.S. §301(a), and, therefore, "a Commonwealth agency for the purposes of the Judicial Code." *Mercury Trucking*, 55 A.3d at 1068 n.4. As for *Bradley*'s broad characterization of section 102 of the CAA as providing a "complete list" of independent agencies, *Bradley*, 550 A.2d at 262, we regard this as *obiter dicta*, for *Bradley* was concerned

24

simply with ascertaining the status of the Turnpike Commission, not identifying every independent agency in the Commonwealth.

### III. Public Property

Finally, we reject the Fund's suggestion that the PUC's action concerns merely private property and interests. As noted above, the *nullum tempus* doctrine applies when a Commonwealth party seeks to "vindicate public rights and protect public property." *J.W. Bishop*, 439 A.2d at 104. The doctrine, after all, is derived from the "great public policy of preserving public rights, revenues[,] and property from injury and loss." *Id.* The Fund's primary argument in this regard is that the funds at issue were derived from PECO revenues, rather than taxes. However, the Fund cites no authority for the proposition that *nullum tempus* applies exclusively to actions relating to tax revenue.[13]

The disputed funds were not gifted to the Fund to use in any manner that it sees fit. As set forth in the PUC's Complaint, PECO transmitted approximately $21 million to the Fund pursuant to its comprehensive restructuring plan in connection with

---

[13] The Fund also cites *Allegheny Intermediate Unit v. East Allegheny School District*, 203 A.3d 371, 378 (Pa. Cmwlth. 2019), for the propositions that *nullum tempus* does not apply where a government agency is "not required to enter into the contract," and that the agency must be seeking enforcement of "obligations imposed by law." (Fund's Br. at 27-28.) However, the Fund acknowledges that these propositions relate to the invocation of *nullum tempus* by a *local government*, which the Fund recognizes as imposing a "stricter" standard than that applicable to Commonwealth parties. *Id.* at 28. Indeed, our jurisprudence recognizes that the *nullum tempus* doctrine is narrower when applied to local governments, rather than Commonwealth agencies such as the PUC. *See, e.g.*, *Delaware County v. First Union Corporation*, 929 A.2d 1258, 1261 (Pa. Cmwlth. 2007) ("Under the doctrine of *nullum tempus*, statutes of limitations are not applicable to actions brought by the *Commonwealth or its agencies* unless a statute expressly so provides. *Local governments* are political subdivisions of a state and *are entitled to assert the* nullum tempus *privilege under only limited circumstances*. In order for *nullum tempus* to apply, a municipality's claims must (1) accrue to the municipality in its governmental capacity and (2) seek to enforce an obligation imposed by law as distinguished from one arising out of an agreement voluntarily entered into by the defendant.") (emphasis added; internal quotation marks omitted).

25

the Electricity Generation Customer Choice and Competition Act, in accordance with a rate specified and approved by the PUC in the 1998 PECO Restructuring Settlement Order. (Compl. ¶¶19, 21, 23-24, 28.) The money was sourced from members of the public, at a rate authorized by the PUC pursuant to its function of approving public utility rates. (PUC's Br. at 32 (citing 66 Pa.C.S. §1301).) The express purpose of this money was for the Fund to issue "loans and grants for economic development projects which have a job impact in the PECO service territory." (Compl. ¶19.)

The PUC's action is plainly based upon its contention that money paid by members of the public—PECO ratepayers—is not being utilized for the public purpose for which it was directed to the Fund, namely the fostering of job growth in the community and, thus, reinvestment into the community's economic well-being. Stated generally, the PUC's action seeks to ensure that money paid by the public is to be used for the benefit of the public, not merely for the growth of the Fund's financial resources. To that end, we note and agree with the PUC that the relief requested in its Complaint supports the PUC's contention that it seeks to vindicate public rights, rather than advance its own interests. Specifically, the PUC proposes the remedy of returning PECO ratepayer funds retained by the Fund to either: "(a) PECO's hardship fund, (b) Universal Service Programs, (c) PECO customer rate relief, [or] (d) . . . the companion fund set up by the same [1998 PECO Restructuring Settlement Order], the Sustainable Development Fund . . . ." (Compl. ¶99.) That is, the PUC clearly seeks to use the disputed funds for the public benefit. As such, and for the reasons stated above, we conclude that the PUC's action is directed toward the public policy of "preserving public rights, revenues and property from injury and loss." *J.W. Bishop*, 439 A.2d at 104.

## Conclusion

In sum, we find ample support for the conclusion that the PUC, an "independent administrative commission," 66 Pa.C.S. §301(a), is a "Commonwealth agency for the purposes of the Judicial Code . . . ." *Mercury Trucking*, 55 A.3d at 1068 n.4. Specifically, and notwithstanding the nuances of the CAA, which for present purposes is inapposite, the PUC is a "commission . . . of the Commonwealth government which [is] not subject to the policy supervision and control of the Governor," and thus qualifies as an "independent agency" within the meaning of the Judicial Code. 42 Pa.C.S. §102. This, in turn, renders it a "Commonwealth party" for purposes of sovereign immunity, *id.* §8501, and, thus, for purposes of the *nullum tempus* doctrine. *Smith*, 618 A.2d at 1217. Moreover, we find it clear that the PUC's action seeks to vindicate public rights and to protect public property—namely the money paid by members of the public and earmarked for the public's benefit—such that recourse to the *nullum tempus* doctrine is warranted.[14]

Because the Fund has not demonstrated a clear right to judgment as a matter of law, Pa.R.A.P. 1532(b), the Fund's Application is denied.[15]

_____

PATRICIA A. McCULLOUGH, Judge

---

[14] In light of our disposition, we need not address the parties' differing views of when the PUC's cause of action accrued. We further offer no opinion at this juncture as to the substantive merits of the PUC's claim of breach of the 2010 Settlement Agreement. Rather, we hold only that the PUC's claim is not barred by any statute of limitations.

[15] On March 22, 2021, following oral argument, the Fund filed an application for leave of court to file a supplemental memorandum of law, addressing *Delaware County*, *see supra* note 13, which the PUC had cited at oral argument. We will grant the Fund's application.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Public Utility    :
Commission,    :
          Petitioner    :
   :  No. 491 M.D. 2018
        v.    :
   :
Delaware Valley Regional Economic    :
Development Fund, John Coffman,    :
Lauri A. Kavulich, Thomas Jay Ellis,    :
Gaetano Piccirilli, Albert Mezzaroba,    :
Anthony DiSandro, Roseanne    :
Pauciello, Jonathan Ireland, William    :
Martin, Thomas Muldoon (in their    :
official capacity),    :
          Respondents    :

# *ORDER*

AND NOW, this 5th day of May, 2021, the Application of Respondent Delaware Valley Regional Economic Development Fund (Fund) for Leave of Court to File a Supplemental Memorandum of Law in Support of Application for Summary Relief Dismissing Petitioner's Complaint on the Pleadings is GRANTED. The Prothonotary is directed to accept for filing and to place upon the docket the supplemental brief attached to the Fund's March 22, 2021 Application. The Fund's Application for Summary Relief Dismissing Petitioner's Complaint on the Pleadings is DENIED.

_____
PATRICIA A. McCULLOUGH, Judge